Ivan C. McLEOD, Regional Director of the Second Region of the National Labor Relations Board for and on behalf of the NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

GENERAL ELECTRIC COMPANY, Respondent.

No. 66 Civ. 2155.

United States District Court
S. D. New York.

Aug. 18, 1966.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Julius G. Serot, Asst. Gen. Counsel, for petitioner Sidney Danielson, Jacques Schurre, Oscar Geltman, Alan H. Randall, New York City, of counsel.

Nordlinger, Riegelman, Benetar & Charney, New York City, for respondent, David L. Benetar, Thomas F. Hilbert, Jr., Richard P. Lawlor, Herbert D. Schwartzman, New York City, of counsel.

Irving Abramson, New York City, Ruth Weyand, Washington, D. C., for the International Union of Electrical, Radio and Machine Workers, AFL–CIO, the charging party.

## OPINION

FRANKEL, District Judge.

■ On May 9, 1966, the International Union of Electrical, Radio and Machine Workers, AFL–CIO (IUE) filed with the National Labor Relations Board a charge alleging that respondent, General Electric Company, had violated Sections 7, 8(a) (1), and 8(a) (5) of the National Labor Relations Act, as amended, 29 U.S.C. §§ 157, 158(a) (1), and 158 (a) (5), by refusing, on and after May 4, 1966, to recognize, meet, and bargain with an IUE bargaining committee. On July 13, 1966, the Board's General Counsel, through Regional Director McLeod, petitioner herein, issued a complaint and notice of hearing on the charge. Two days later, by order to show cause, the Regional Director, for the Board, petitioned under Section 10(j) of the Act, 29 U.S.C. § 160(j), for a temporary injunction restraining the allegedly unlawful conduct. An evidentiary hearing was conducted through the week beginning July 25, 1966. Now, upon the record thus made, and instructed by the able briefs and oral presentations of counsel,[1] the court reaches the following findings and conclusions.

---

1. The charging union appeared by counsel, not strictly as a "party," and was permitted to examine and cross-examine the witnesses for both sides as well as to make legal submissions. The Chamber of Commerce of the United States and the National Association of Manufacturers of the United States joined in, and

## I.

The respondent is a New York corporation engaged in the manufacture, sale, and distribution of electrical and electronic equipment, chemicals, plastics and other things, including a variety of products for the national defense and atomic energy programs. It has some 290,000 employees, over 60 plants spread through 30 states, and more than 400 other installations (service establishments, warehouses, etc.), so that its physical properties and operations reach into every State in the Union. Approximately half its employees are unionized, and there is a total of about 150 bargaining units. Overall, the Company deals with more than 80 labor unions.

For the most part, respondent bargains, at least formally, in separate negotiations for each bargaining unit. The three exceptions to this pattern are the IUE, the United Electrical, Radio and Machine Workers (UE), and the Pattern Makers' League. With these three Internationals, the practice has been to negotiate national agreements, supplemented by local unit agreements to encompass particular local conditions and problems.

The IUE represents about 80,000 of respondent's employees in some 65 to 70 bargaining units. In a substantial portion of these units, the International Union as such is the certified representative. In others an IUE local is certified. Notwithstanding the individual unit certifications, and the differing designations of the International or a local as representative, the practice, as noted above, has been to conduct national bargaining for a national agreement covering all IUE units, supplemented by local agreements. The local agreements are designed as additions to, not variations from, the national contracts, which cover such basic matters as wages, hours, seniority, and arbitration procedures.

For these national negotiations, the IUE elects a General Electric Conference Board, comprised of representatives from both the International and local unions. The Conference Board in turn elects some 10 to 15 or more members to a Negotiating Committee, which meets at the bargaining table with a group designated by the Company.[2] In addition to these elected members, the Negotiating Committee has normally included people like the Union's general counsel, publicity workers, the research director, and other technicians. These additional members participate in discussions at the bargaining table and in the Negotiating Committee's internal councils, but they have no voting rights, which are reserved to the elected members. As will appear below, the nub of the present controversy is the extent of IUE's right to designate such additional, non-voting members of its Negotiating Committee—or, conversely, of the Company's right to hold such designees unacceptable or impermissible.

To complete briefly the procedural outlines on the Union's side: the Negotiating Committee is required to report on the progress of bargaining to the Conference Board. From time to time there are minority as well as majority reports. The Conference Board determines the Union's position on any given question, including ultimately whether a proposed national agreement should be signed.

In recent years the Company has developed a fairly uniform course for

---

were granted leave to file, a brief as *amici curiae* supporting the respondent. A motion was filed by the National Electrical Manufacturers Association seeking to have its name added to that brief. The motion, which offered no enlightenment except to say this Association was deeply interested in the outcome and had nothing to add to what the *amicus* brief on file already said, was denied. The court is not assisted by such incomplete polls showing the weight of numbers, apart from reason, on one side or the other of a controversy. Cf. Wiener, Briefing and Arguing Federal Appeals 269 ff. (1961).

2. Between contract negotiations, the Negotiating Committee meets with company representatives on grievances and other problems arising under the contract.

handling and coordinating its national and local bargaining activities. As described by its Labor Relations Counsel, the practice is to formulate a set of national company proposals for presentation to the IUE and the UE, two of the three unions with which there is bargaining on a national scale. Before these proposals are presented to the unions, the Company's employee relations managers are called to the New York main office, where copies are given and explained to them. The Company then presents the proposals to the IUE and UE. Normally within a day or two thereafter (in one instance, at the IUE's request, there was a five-day delay), upon instructions from the New York headquarters, the same proposals are given by the local managers to the local representatives around the country of all the varying unions with which the Company deals on a so-called local basis—e. g., locals of the International Brotherhood of Electrical Workers (IBEW), International Association of Machinists (IAM), Sheet Metal Workers (SMU), and others. At the same time, and commonly before the unions have announced their acceptance or rejection, the uniform set of proposals is publicized to the Company's employees. This mode of centralized administration, despite the multiplicity of bargaining units and representatives, is rendered feasible in part because the Company's collective agreements, with an insignificant number of exceptions, have uniform expiration dates.

Testimony for the Company indicates that its local managers have some small measure of discretion for handling local problems by means of particularized local provisions. The discretion ends, however, at the point where questions deviate from the routine. At this point, the local managers are expected to seek advice, and evidently consent, from the New York office. Whatever the precise internal definition of these managerial powers may be, the ultimate fact is that all of the Company's offers to the many

unions turn out to be substantially uniform in their basic provisions. And the substantial uniformity appears to extend to the agreements eventually concluded.

For some years before the events giving rise to this proceeding, the IUE and other unions representing respondent's employees were growing increasingly restive and self-critical over the results of their separate, mutually isolated efforts to cope with the Company's centralized bargaining strategy. They found themselves outmaneuvered repeatedly when the Company announced that one or more unions had accepted a proposal and used this as leverage to wrest agreement from a more obstinate representative. They believed (although it is unnecessary for present purposes to decide whether they were right) that the Company's technique had tended to divide and conquer them, so that the terms and conditions of employment for General Electric employees had fallen behind others in comparable industries. They concluded that a program of mutually agreed "national goals" was needed to meet the Company's offering of identical national proposals. It was thought moreover, that there should be a means and a program for communication between the interested unions, mutual research assistance, coordinated publicity—in short, a substantial measure of "unity" and joint bargaining.

Acting on such views, the AFL–CIO, through its President, George Meany, called a meeting in October 1965 of a group of presidents or other representatives of international unions which (or locals of which) had bargaining relationships with respondent. Christened the Committee on Collective Bargaining, the group at its initial meeting contained officials of the IUE, IBEW, IAM, United Automobile Workers (UAW), Allied Industrial Workers (AIW), and American Federation of Technical Engineers (AFTE).[3] It was determined at the meeting that there should be a

---

3. The Committee was later enlarged to include the Sheet Metal Workers (SMU) and the American Flint Glass Workers (AFGW).

"coordinated approach" to the forthcoming 1966 negotiations with respondent. A Steering Committee was named, with responsibility for implementing the initial policy determinations, and the structure of some other committees was outlined. It was agreed that there should be a cooperative program of research, education, and publicity, and an effort to evolve a set of "national goals" on wages and other working conditions. It was understood that each individual union, within its own constitutional framework, would control its own bargaining and retain the autonomous power to decide what agreements it might make with respondent. It was also understood, however, at least tacitly, that there would be consultation and an exchange of views if and when any union in the group decided to abandon or deviate from any "national goals" that might result from the inter-union deliberations.

Following the formation of the Committee on Collective Bargaining, and mainly under the leadership of its Steering Committee, a number of steps were taken to implement the "coordinated approach" to bargaining with respondent. At the AFL–CIO convention in December 1965, a resolution was adopted reciting that the unions represented on the Committee had "joined together to form a common collective bargaining front for the negotiations * * * in 1966" with respondent and Westinghouse Electric Corporation. The group, the resolution continued, "plan to develop national goals which they will jointly support and prevent the corporations from playing one off against the other." Reciting the view that respondent (and Westinghouse) had lagged behind other major industries in granting employee benefits, the resolution said:

"The seven unions have expressed their determination, through an insistence upon genuine collective bargaining, to not only secure action in 1966 on pension and insurance problems, but also to assure their membership the benefits of the breakthroughs being made in recent labor-management agreements on other contractual matters.

"Experience has shown that in industries in which a number of unions operate, such coordination of collective bargaining is the only way large corporations can be made to face up to their responsibilities. * * *

" * * * Therefore, be it

"RESOLVED: We pledge the full support and resources of the AFL–CIO to the efforts of the Committee on Collective Bargaining, representing the seven unions, to secure justice for their membership in these negotiations, and call upon all affiliated unions to join us in this pledge."

Speaking in support of that resolution, IUE President Paul Jennings said:

"As these corporations grow larger and more diversified, it becomes more and more difficult for individual international unions to deal effectively with the corporation's technique of attempting to settle with one union, and then come to the others with an accomplished fact. What we have done, therefore, is recognize the basic fact that we have the responsibility to deal with each other as autonomous unions."

On March 15, 1966, the cooperating unions, now totalling eight, published a document entitled "Program for Progress." On its cover it bore a symbol consisting of a circle of links connecting boxes showing the initials by which the eight internationals are known. Within the circle appeared the legend: "We unite for a greater measure of justice." The text of the paper was preceded by a heading announcing "Joint Union Collective Bargaining Demands for GE-Westinghouse 1966 Negotiations," further characterized by a subheading that said: "National goals adopted by over 300 delegates from the 8 International Unions at the Conference on National Collective Bargaining Goals in Washington, D. C. on March 15, 1966." The document then proceeded to list, and later to elaborate upon, a series of three "eco-

nomic issues"[4] and six "non-economic contract clauses"[5] the unions proposed to press in the forthcoming negotiations. The paper concluded with a "Resolution on Unity" which said, *inter alia:*

"It is now time for us to convey the details of this program to the membership of our local unions. At the same time we must communicate with the public in a manner which will create sympathetic understanding of our program and of our objectives. * * *

"We have developed a sound basis for coordinated negotiations as the result of the spirit of mutual respect and confidence which has been developed to new levels during recent months. * *

4. "I. Wages
"A. A substantial wage increase to catch up on past wage short-fall, plus an annual improvement factor based on increased productivity and output.
"B. A planned program to end geographical differentials for the same type of work.
"C. A cost of living escalator providing for one percent of wages for each one percent increase in the cost of living.
"II. Holidays and Vacations
"A. Nine paid holidays—double time for holiday work, plus the holiday pay.
"B. A progression schedule on vacations for hourly employees that would provide for a graduated vacation between 1 and 5 years' service, between 5 and 10 years' service, and between 10 and 20 years' service. A proportionate increase in paid vacation benefits for salaried employees.
"C. A vacation bonus of 25 percent of wages.
"III. Income and Employment Security
"A. The SUB [Supplementary Unemployment Benefit] type of layoff benefit plan.
"B. Restrictions on overtime where people are on layoff; double time for all overtime hours.
"C. No contracting out of work historically performed by employees in the bargaining unit when skills, manpower and facilities are available.
"D. The right to move with the job; employees shall have preference over new hires in plants to which their jobs have been moved, or where there is a build-up of operations and a curtailment of job opportunities in the home plant.

"While we come together as representatives of eight different unions accustomed to negotiating with the GE and Westinghouse Corporations on a union by union basis, the companies' representatives have dealt with us and will continue to attempt to deal with us, either locally or nationally, under a centrally controlled program. The fact is that even though the companies have opposed company-wide bargaining on any issue they have, in fact, insisted upon the implementation of company-wide policies during contract negotiations.

"By the action we have taken here today we intend to confront company-wide policies with a union-wide program.

A reasonable moving expense shall be paid.
"E. A joint labor-management program shall be developed leading to a progressive shortening of the work week and work year.
"F. Provision for 6 days paid sick leave per year for hourly employees. Proportionate increase in paid leave for salaried employees."

5. "I. A full arbitration clause with no restrictions.
"II. The full union shop.
"III. Automation provisions which would provide for:
"A. Program of retraining of employees to prepare them for new skills that will be needed by changing technology.
"B. Rate retention and/or increases when jobs have become automated.
"C. The maintenance of the bargaining unit against erosion under automation.
"D. Maintenance of job security by some form of attrition clause.
"IV. Continuity of Service. A minimum of two years and time-for-time above two years' service for periods of layoff.
"V. Anti-Discrimination Clause.
" 'The Company agrees that it will not discriminate against any applicant for employment, or any of the employees, in payment of equal wages, assignment to jobs, seniority, promotions, training, transfer, layoff, discipline, discharge, or any other term or condition of employment, because of race, color, religion, marital status, sex, age, or national origin.'
"VI. Pension and Insurance Program.
"Details to be found in the Pension & Insurance Fact Sheets."

"Our members will know and the companies will know that all bargaining units will be directing their energies toward the same national goals.

"Of course, in addition, each union will have an opportunity to pursue additional goals necessary to meeting its own problems. * * *

"In the light of these simple and common-sense principles, it is a matter of deep regret, that at least twice in recent weeks, General Electric officials have launched bitter, yet, totally unfounded, attacks upon our efforts. They accuse us of wanting to carry on meetings with the company 'in secrecy' and of wanting to take away the rights of bargaining units to carry on their negotiations; the company charges that our activities will lead to 'industry-wide bargaining' with 'strikes and unsound settlements' and 'economic strangulation,' which, of course, is not true. * * *

"Not only do we reject this obvious attempt to confuse and divide us, but we pledge to each other our mutual cooperation, our mutual understanding and our mutual support."

At the meeting in which the foregoing Program and Resolution were adopted, IUE President Jennings observed that the cooperative effort gave the lie to those who had deemed such a thing inconceivable because of inter-union jealousies, rivalries, suspicion, and mistrust. He rejected as misleading propaganda the management view that the joint effort would impair the power of individual unions to bargain for themselves. He said: "What concerns these corporations, is that each group as it bargains will have the confidence that all the other bargaining groups are going to be asking for the same national goals."

Implementing the decision to publicize the joint program and educate the memberships of the several unions, the Committee on Collective Bargaining created a publication called "Unity," the first issue of which (dated March 1966) announced that it would "be distributed to all GE and Westinghouse workers from time to time during the eight-union drive." To the same end, a series of so-called "grass roots meetings" was scheduled and held for the companies' workers in various places around the country, with one or another of the cooperating unions acting as "host" on each occasion.

In the course of these collaborative efforts, people identified with IUE said, or were quoted as saying, on two or three occasions that there was an intention under the unity program "for no one to sign a contract with General Electric until all parties sign." The quoted words are from a one-page mimeographed "flyer" distributed by IUE Local 320 (Syracuse, N. Y.), and produced in evidence by respondent from the full dossier it keeps of such documents. A newspaper reporter for a Fort Wayne, Indiana, newspaper, called as a witness by respondent, quoted a similar statement of March 3, 1966, attributed to John Callahan, Chairman of the IUE's General Electric Conference Board and Negotiating Committee. Although it filed such statements, and later gave them in evidence here, respondent never mentioned them to anyone in IUE responsible for negotiations, deeming it a waste of time to make any direct inquiry into the Union's position.

Despite the foregoing statements, it seems clear, and I find, that there was never any agreement, express or implied, among the cooperating unions that none would sign with respondent unless all signed. It was tacitly understood that before any of them varied or abandoned any of the agreed "national goals," they would inform and consult with each other. The cooperative arrangements were instinct with the objective of approaching, as nearly as possible, the kind of unitary stance respondent regularly took vis-á-vis the several unions. But each union retained the "autonomous" status affirmed in the AFL–CIO resolution of December 1965, so that each was free at all times to sign with respondent on terms it deemed acceptable for its members. Moreover, as will appear later, this

question whether the cooperating unions were "locked in," though extensively canvassed in the hearing and briefs, turns out in the end to be essentially irrelevant to the issue before us.

We come, finally, to the events directly generating this proceeding. As the evidence unfolds, the story may start with a telegram of November 16, 1965, from the (then) seven-union Steering Committee to respondent's Philip D. Moore, raising pension and Social Security issues with the substance of which we are not concerned. In a wired response the next day, after stating the Company's position, Mr. Moore said:

"We note that your telegram listed the names of several representatives of other unions. However, this telegram is addressed to you as a representative of the IUE since we do not bargain with their unions at the national level. We assume, of course, that these gentlemen will continue to be in touch with their respective local union officials who in turn are always free to discuss appropriate matters covered by their local contracts with local managements."

On November 24, 1965, Mr. Moore confirmed in a letter to Mr. Callahan a proposal respondent had made for the creation of subcommittees to explore preliminarily the subjects of grievance procedure, contract language, and employment security, beginning in December 1965, as groundwork for the negotiations formally scheduled to begin in August 1966.[6] Answering for IUE on December 21, Mr. Callahan objected to some of the substantive and procedural thoughts Mr. Moore had expressed, and made some

counterproposals for the subcommittee procedure. Mr. Moore treated of these views in another letter dated January 20, 1966. In answer to this, on February 7, 1966, the Committee on Collective Bargaining wrote to Mr. Moore, observed that the subcommittee problem had been "the subject of considerable discussion" between the Company and the several unions, and said:

"Since the matter is common to the eight AFL-CIO unions which are joined together in preparation for these negotiations, and we have given it considerable thought, we are offering you our joint thinking."

After outlining the promised "joint thinking," this letter said:

"Since our eight unions have a jointly developed approach on how to create the most successful type of meetings, and since your management has a national policy on this matter, the simplest and most effective solution is a conference between us."

On February 15, the Steering Committee wrote again to Mr. Moore, this time on one of the Social Security problems mentioned earlier herein. Among other things, the Committee wrote in this letter:

"Since your offer to each of our unions is the same and we have considered this matter jointly, we believe it would be to the best advantage to all considered that we have a joint meeting in order to discuss your proposals."

On February 24, Mr. Moore wrote three letters in evidence here. The first, to Joseph Swire, IUE's Pension and Benefit Consultant, referring to claimed

---

**6.** Since the collective agreement freed both parties from any enforceable obligation to bargain until a date no earlier than mid-August 1966, there was a potential threshold issue for the case at bar whether there could be a basis for charging respondent with a refusal to bargain as early as May. The Company, in what seems an eminently sound and statesmanlike view of the matter, recognized that the central problem in the case would

remain no less real and unresolved if it were put off until August or later, so that the only real result would be to heighten the atmosphere of crisis in which an adjudication was had. Accordingly, without waiving any contract or other rights for any other purpose, respondent has agreed that there is no contention in this case that the Union's demand for bargaining is premature.

misconceptions in the Steering Committee's February 15 letter, said:

"It would be most inappropriate for us to respond to the Steering Committee as they requested in their recent letter since this would only serve to create an illusion that national negotiations on benefits are now in process and that locally negotiated contract agreements are subject to alteration at the national level.

"You can help to clarify this matter by advising your associates in the other unions that no arrangements have been made between IUE and General Electric which would require or facilitate multi-union negotiations or discussions in that direction."

Mr. Moore's second letter, to David Lasser, Assistant to the President of IUE and Chairman of the Steering Committee, protested the proposed "coalition" approach by the unions, observing, *inter alia:*

" * * * It now appears that [there] * * * is a bid for General Electric to recognize this group as a merged negotiating body. Apparently this new group is seeking to take over negotiations that historically have been carried on by the IUE here in New York, and independently by the seven other unions at the Company locations where they are certified.

"We realize that it is not our place to advise you and your associates on internal union affairs and that arrangements for coalitions and mergers for negotiations purposes have been publicized before as indications of intra-union cooperation. We also realize that the officials of the unions involved may actually have some organizational authority to give up their independence at the bargaining table for tactical reasons.

"We are not responding to your Steering Committee's two recent letters because by doing so it might create the mistaken impression that national bargaining with local bargaining units is in effect; this is clearly not the case nor do we believe it should be. * * * "

The letter went on to portray the dangers and defects of "industry-wide bargaining," expressed fears of "experimenting with techniques that go in the direction of unnecessary strikes and unsound settlements," and concluded that such evils could "be the long-term hazard of any coalition in our industry."

Mr. Moore's third letter of February 24 was to Mr. Callahan, congratulating him on his re-election as Chairman of the Conference Board, urging that the parties move forward on the subcommittee problem, and enclosing a copy of the preceding letter to Mr. Lasser. Repeating his objections to "coalition bargaining," Mr. Moore wrote in this letter " * * * I want to assure you now that there is no likelihood that we will obstruct negotiations with your union nationally or with the other seven unions locally (where they are certified to negotiate) by engaging in coalition bargaining."

In a reply of March 10, 1966, among other points of disagreement, Mr. Callahan chided Mr. Moore for "choos[ing] to ignore the suggestions of the eight unions completely and, instead, propos[ing] that [the parties] start subcommittee meetings on [respondent's] unilaterally determined basis."

On March 23, 1966, the eight-union Committee pressed its efforts toward joint sessions in a telegram to respondent's President, Fred J. Borch, reiterating such points as the following:

"The contracts of our eight unions with GE on the major issues considered by the [Union] Conference are the same and we naturally have developed a common program to improve our agreements. * * *

"In order to canvass this whole problem [of a peaceful settlement] facing us jointly as an attempt to lay the groundwork for such collective bargaining, we propose an early meeting with you and your representatives.

"Such a meeting would be informal and would involve no commitments as to future action by either group."

Mr. Borch telegraphed a rejection of this proposal on March 25. On the same day, Mr. Moore wrote again to Mr. Callahan, enclosing a copy of the Borch wire, referring to his letter of March 22 on the subcommittee problem, and repeating that the Company remained "receptive to appropriate pre-negotiation discussions with IUE, but * * * [did] not intend to participate in any eight-union coalition discussions or in any other steps in the direction of industry-wide bargaining."

In his reply to Mr. Moore dated April 13, 1966, Mr. Callahan announced a significant change of position. He said the Committee on Collective Bargaining and IUE's membership "were truly disappointed that the officials of General Electric did not find it possible to accept the request of the eight union presidents for an informal meeting" to discuss a joint approach. "However," he continued,

"it is clear that General Electric is not willing to hold any such joint meeting, even though it may be informal. The IUE did not intend by its telegram any formal request for joint negotiations. Speaking for the IUE–GE Conference Board, we will not pursue that matter any further and will abandon any suggestions for any such joint meeting or for joint discussions."

He went on to discuss still outstanding differences concerning the proposed subcommittee procedure, then said:

" * * * We believe the only way to satisfactorily deal with all of these problems and attempt to resolve them is by a meeting between your representatives and our Negotiating Committee. The IUE–GE Negotiating Committee therefore requests that your Company meet with it to discuss all of the problems I have mentioned, including the agenda of subject matters for, the number of and the scheduling of, the proposed sub-committee meetings."

Replying on April 20, Mr. Moore expressed his satisfaction with the foregoing statement of IUE's position. He suggested, and it was soon agreed, that the committee for the Company and the IUE should meet at 10 a. m. on May 4 "in the usual Conference Room" at the Company's offices.

In preparation for that meeting, as stated in an IUE statement prepared for delivery to respondent, the Union added to its Negotiating Committee, as non-voting members, one representative from each of the other seven unions that had comprised, with IUE, the Committee on Collective Bargaining. The seven were needed, it was thought, to give the benefit of their experience in negotiating with respondent, and to supply adequate inter-union communication as a means of avoiding the "whipsawing" respondent was thought to have accomplished in the past. It was not intended by adding these members to bargain for any unions other than IUE. Nor did the additions reflect any understanding that a proposed agreement between IUE and respondent would be subject to approval or disapproval by any other union.

The IUE Negotiating Committee, with the seven men from other unions, arrived at the appointed meeting place at about 9:45 a. m. on May 4. Some of the seven were wearing lapel buttons reflecting their membership in other unions. A member of respondent's staff, observing this, hastened to report it to Mr. Moore, who made it the subject of a speedy discussion of strategy with his committee. Respondent's committee concluded that the inclusion of the seven in the group ostensibly appearing for IUE was a breach of faith, or, at the least, an attempt to use and apply the Labor Board's recent decision in American Radiator & Standard Sanitary Corporation, 155 N.L.R.B. No. 69 (November 1965), which upheld the propriety of such additions to a union negotiating team. Advised by its counsel that the Board's *American Radiator* decision should be

deemed unsound, and that it should not be followed, respondent's committee concluded that it would not meet with the IUE group while it included the seven "outsiders." It was decided that the Company's group would repair to the conference room, that Mr. Moore would state the position, and that they would then depart without tarrying.

The plan was executed. Mr. Moore and his colleagues went to the conference room, filed around the table, and greeted those who had arrived earlier. With all, or substantially all, of the unwanted seven, there was a brief, approximately uniform conversation. As Mr. Moore and each of them exchanged introductions, he said: "I see your're from [naming a union other than IUE]." To which each replied that he was appearing this day as a member of the IUE Committee.

Following the tour of the table, the Company's people took seats on their side. Mr. Callahan said he had a statement to make. Mr. Moore said he had one to make first, and he proceeded to do so. He said he "must have come to the wrong meeting;" that he would not be a party to "coalition bargaining;" that he deemed the meeting recessed to 2 p. m., at which time those on the other side were invited to return "with an IUE Committee," excluding people from other unions. Mr. Callahan and IUE's general counsel requested an opportunity to explain, putting their requests more shrilly as the Company's people prepared to leave. They managed to shout that their group was intended to be "an IUE Committee," but no more than that before Mr. Moore and his colleagues swept from the room. The whole episode took about ten minutes.

Later in the morning, Mr. Callahan delivered to Mr. Moore, at the latter's office, a letter composed after the brief conference room encounter. The letter said the Union was "shocked at [Mr. Moore's] refusal to meet the IUE–Negotiating Committee and * * * intemperate and arbitrary refusal to permit the Committee to respond to [Mr. Moore's] false enunciation of the purpose of [the] Committee." It announced IUE's readiness to resume the meeting at 2 p. m., but insisted that the Union had a "right to choose the representatives of [its] own Committee", and rejected any suggestion that the Company could "designate the composition" of the Committee.

The parties have adhered to their positions. On June 8, 1966, the Company filed with the Labor Board a charge accusing IUE, the Committee on Collective Bargaining, and the other unions in that Committee of violating Section 8(b) (1) (A) of the National Labor Relations Act, 29 U.S.C. § 158(b) (1) (A), by, *inter alia*, engaging "in an illegal concerted, collusive effort to force GE to recognize and bargain with CCB as the representative of the aggregate of employees represented by the eight named labor organizations"; entering "into an illegal contractual arrangement under which each will be precluded from entering into a collective bargaining agreement with General Electric Company unless and until all the unions have agreed to enter into such agreement;" and thus restraining and coercing respondent's employees in the exercise of their right under Section 7 of the Act, 29 U.S.C. § 157, "to bargain collectively through representatives of their own choosing * * *." On July 13, 1966, petitioner wrote respondent and announced his view that there was no basis in the evidence for issuance of a complaint on this charge. Respondent has obtained an extension of time to appeal this ruling to the Board's General Counsel.

As noted much earlier, the IUE, on May 9, 1966, had filed the charge leading to the complaint and the Board's decision to bring the present proceeding for injunctive relief.

## II.

■ The ultimate legal issue in the case is this: Taking account of all the background events and exchanges, has the Company been justified, since May 4, 1966, in refusing to meet with the group

tendering itself as the "IUE Negotiating Committee" on the single stated ground that the group included seven non-voting members who normally represent other unions comprising (with IUE) the Committee on Collective Bargaining? I conclude that the Company has not been justified; that there is compelling ground to expect eventual findings by the Board establishing the alleged unfair labor practices; and that the relief petitioner seeks is just and proper. The bases for these conclusions—composed primarily of reasons for rejecting respondent's defensive theories—are as follows:

*First,* a preliminary issue: concerning respondent's proposal to investigate the Board and the Regional Director

At the outset of the injunction proceeding, respondent served a subpoena duces tecum upon petitioner seeking statements obtained by Board investigators, internal Board memoranda, "and all documents considered by the Board members in their agenda meeting at which authorization allegedly was granted" to bring this action. Upon argument of a motion to quash, respondent's counsel undertook to explain the purpose of the subpoena by stating, first, that there was "reason to believe that the decision by the Labor Board to instruct the Regional Director to bring this proceeding was made by a divided board, split, we believe, 3 to 2." Exploration of this belief about a non-public, unreported vote would help demonstrate, it was argued, that the case is a close one, and therefore unsuitable for injunctive relief under Section 10(j). In addition, counsel said, the papers sought from the Board's files might show gaps in petitioner's investigation of the matter, and thus go to whether institution of this proceeding was without "reasonable cause."

[3] The motion to quash was granted. There is no justification for, and powerful authority against, the proposed exploration into the processes by which the Board, as a Board, reached the de-

termination on which it acted. See United States v. Morgan, 313 U.S. 409, 421–422, 61 S.Ct. 999, 85 L.Ed. 1429 (1941); Madden v. International Hod Carriers' Bldg. and Common Laborers' Union, 277 F.2d 688, 693–694 (7th Cir.), cert. denied, 364 U.S. 863, 81 S.Ct. 105, 5 L.Ed.2d 86 (1960); Douds v. Wine, Liquor and Distillery Workers Union, 75 F.Supp. 184, 186 (S.D.N.Y.1947). But cf. Sperandeo for and on Behalf of N.L.R.B. v. Milk Drivers and Dairy Emp. Local Union, 334 F.2d 381 (10th Cir. 1964); Madden for and on Behalf of N.L.R.B. v. Milk Wagon Drivers Union, 229 F. Supp. 490 (N.D.Ill.1964). Assuming for argument's sake, as I did in quashing the subpoena, that there was dissent within the Board, the court is not authorized to investigate and weigh that in appraising the case. Similarly, it could not comport with the respect owed to the "integrity of the administrative process" (United States v. Morgan, supra, 313 U.S. at 422, 61 S.Ct. 999), to allow a trial of the regional director's performance of his investigative duties before proceeding to the trial that official has been authorized and instructed to seek against respondent. In any event, "the adequacy of the investigation is judicially tested only by the Board's subsequent ability to sustain its initial determination that the investigation disclosed reasonable cause to believe that a violation occurred." Madden v. International Hod Carriers', Etc., Union, supra, 277 F.2d at 693. That test, as should become apparent from what is said herein, has been amply met.

*Second,* respondent's asserted justification for refusing to meet with the Negotiating Committee tendered by the IUE

Since respondent's group literally walked out and refused to talk with the IUE Committee, the case in its substantive aspect starts with what appears on its face to be the boldest and most explicit form of refusal to bargain. The problem, then, as the parties have joined in presenting and contesting it, is whether respondent has been, and is now, justi-

fied in its steadfast refusal to meet while the IUE Committee includes seven individuals whose usual identification is with other unions that deal in other units with respondent. To put the claimed justification in its own words: "Respondent contends that the charging union's pretended renunciation of its drive for joint bargaining is sham, and that its claimed reserved right of independent action is the emptiest formality."[7] Further, respondent says, in light of what had gone on before,

> "the charging union had no right, over the Company's objection, to introduce into the bargaining with the Company, and insist upon the presence thereat of men who—however denominated by IUE—were in fact representatives of other unions. For in doing so, IUE(a) injected into the IUE-GE negotiations the potential of conflict among unions should their individual interests, as the bargaining proceeded, differ from their announced common goals, and thereby (b) exceeded the limits imposed by law on the selection of its bargaining representatives."[8]

In some of respondent's other words, "if IUE never truly cast off the taint of illegality which marked its efforts at joint bargaining, respondent was not under a duty to bargain with its expanded committee on May 4th."[9]

In resolving the controversy generated by these contentions, it has seemed helpful, first, to recall the principles that circumscribe the rights of either negotiating party to set qualifications for the other's representatives; then, to identify and consider the "taint of illegality" which is said to have triggered respondent's withdrawal from the May 4th meeting; and, on this basis, to determine the validity of the claimed justification for this action.

 1. Section 7 of the Labor Act, 29 U.S.C. § 157, guarantees employees the right "to bargain collectively through representatives of their own choosing * * *." Section 8(b) (1) (B), 29 U.S.C. § 158(b) (1) (B), protects employers against restraint and coercion by unions in selecting "representatives for the purposes of collective bargaining * * *." Although there are some differences between the two protections, N.L.R.B. v. Local 294, Internat'l Bro. of Teamsters, Etc., 284 F.2d 893, 896 (2d Cir. 1960), their substantially identical core, pertinent to our problem, is a broad assurance that neither side may select or veto the persons or agents to be employed by the other for negotiations. Ibid.; Standard Oil Company v. N.L.R.B., 322 F.2d 40, 44 (6th Cir. 1963); N.L.R.B. v. Roscoe Skipper, Inc., 213 F.2d 793 (5th Cir. 1954).

Like most rules, this one "is not absolute or immutable." N.L.R.B. v. International Ladies' Garment Wkrs.' Union, 274 F.2d 376, 378 (3d Cir. 1960). It has on rare occasions been the subject of narrow exceptions. So, for example, employers have been sustained in refusing to meet with unions whose ownership of, or investment in, competing businesses posed a "conflict between investment protection and worker representation motives * * *." N.L.R.B. v. David Buttrick Company, 361 F.2d 300, 305 (1st Cir. 1966); see also Bausch & Lomb Optical Company, 108 N.L.R.B. 1555 (1954).[10] Similarly, a union has been held free to refuse to sit down with a company representative recently departed from the union's camp, bearing "years of familiarity from the inside of the union with its strategy, thinking, working, and operations", and introduced "tauntingly and laughingly" by management to show it had "put one over on the union * * *." N.L.R.B. v. International Ladies' Garment Wkrs.' Union, supra, 274 F.2d at 379. And an employer has been upheld in refusing to

---

7. Respondent's Post Hearing Brief, p. 2.

8. Ibid.

9. Id., p. 6.

10. While the cited cases involved employer objections to *unions* rather than particular individuals, their principle seems to warrant respondent's invocation, and our mention, of them.

meet with a particular individual whose "expressed hostility to the [employer] and * * * purpose to destroy the [employer] financially made any attempt at good faith collective bargaining a futility." N.L.R.B. v. Kentucky Utilities Co., 182 F.2d 810, 813 (6th Cir. 1950).

In the handful of such extreme and unusual cases—especially the couple involving objections to individual negotiators—the proposed representatives were held to be so patently obnoxious or tainted by conflict that their very presence at the table belied any "good faith offer to bargain * * *." N.L.R.B. v. Local 294, supra, 284 F.2d at 896.

The analogy respondent attempts between such cases and this one is not impressive. By way of a preliminary, shorthand rejection of the analogy, we note an interesting point of advocacy and the use of precedent. Respondent relies at some length on the 1950 opinion of the Sixth Circuit in N.L.R.B. v. Kentucky Utilities Co., supra, a quaint and scarcely seminal case where the union had apparently agreed that its proffered negotiator was understandably repulsive to the company and should not appropriately have been placed at the bargaining table. See 182 F.2d at 814. On the other hand, respondent's 88-page post-hearing memorandum does not mention once the same Circuit's 1963 holding in Standard Oil Company v. N.L.R.B., 322 F.2d 40, which rejected an employer position indistinguishable in principle from the one pressed here, and which is accordingly invoked by petitioner and the charging union as a closely apposite precedent.[11] In the end, the decision in the case at bar closely follows the rationale of that one. Nevertheless, the court has considered, and it seems appropriate to treat with, the details of respondent's arguments for a different result.

2. Respondent considers at length the Committee on Collective Bargaining, its program and symbols of "unity," its agreement on "national goals"—its status, under respondent's favored label, as a "coalition." It is helpful to isolate the particulars in all this which are said to have left the "taint of illegality" respondent claims as the source of its absolution from the duty to bargain with the IUE Committee. For many of the things respondent stresses about the "coalition" are not suggested even remotely to have been unlawful or in any sense improper.

Thus, there is no contention that it was wrong for the several unions dealing with a single enterprise to consult together. Nor is it intimated that the unions offended the law—or behaved questionably in any pertinent sense—when they succeeded in formulating and unanimously endorsing a set of common goals (to be sought from a common management and a common exchequer) on matters like wages, seniority, holidays, and the like. Cf. United States Pipe and Foundry Company v. N.L.R.B., 298 F.2d 873, 877–878 (5th Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1557, 8 L.Ed.2d 499 (1962); Standard Oil Company v. N.L.R.B., 322 F.2d 40 (6th Cir. 1963); American Radiator & Standard Sanitary Corporation, 155 N.L.R.B. No. 69 (November 1965). It is no less permissible for unions so situated to share research, personnel, ideas, and information. They are allowed, in short, to assist each other and discover if possible areas of agreement, of "unity," and of mutual support in dealing with the unified, unitary, centralized management they confront. At least, subject to the two points considered below, neither respondent's nor our own researches have suggested any different view. And so it is not surprising that the essentially lawful efforts of the eight-union Committee were entirely public, and highly publicized; there appears to have been nothing, and no reason, to hide.

To be sure, the Company perceives a threat in all this. While it takes pains to coordinate its own dealings in all the

11. Respondent does cite a second, different aspect of the Standard Oil case, a pro-employer ruling, which has some bearing here and is touched on below.

many bargaining units, it foresees a danger of "national strikes" from an approach to similar coordination on the other side of the bargaining table. And it may well be true that efforts by the unions to collaborate in the exercise of their "countervailing power" could result, unless responsible people are careful, in larger collisions than the separate unions in isolation from each other might threaten.[12] There is no occasion here to do more than mention such fundamental considerations of power and policy underlying disputes like the one at bar. For the most part, such concerns are outside the province and the competence of courts. At any rate, our problem here remains to identify and deal with the alleged "taint" in the "coalition" which is at the center of respondent's thesis.

What this comes to in the end is two interrelated things: (1) that the eight collaborating unions were bent on a program of "joint" or "multi-union bargaining"; and (2) that they were "locked in" to an understanding that none would reach an agreement with respondent unless all did. Both particulars are found upon analysis to contain fatal defects of fact and of law.

[6] 3. The notion of joint or multi-union bargaining refers in our context to a process of simultaneous bargaining with respondent by several unions representing, and separately certified for, separate units. It is a minimum concensus in the case that a party may seek such joint bargaining, and that the two sides could agree to have it, though it may be unlawful to insist adamantly upon it or use coercion to achieve it after the point of impasse.[13] Thus, when the Steering Committee of the Committee on Collective Bargaining, on three occasions before April 13, 1966, proposed joint meetings on subjects of common interest, its conduct was in no sense unlawful. Nor, on the premises of this decision, was respondent wrong in rejecting those overtures.

Since, on respondent's own submission and on substantial authority (see note 13, supra), the IUE would have trod dangerous ground had it pressed adamantly for joint bargaining, there was substantial reason for it to retreat from this position.

---

12. Professor Galbraith's germinal, and now familiar, concept of "countervailing power" comes quickly to mind in response to the contending views and efforts of the parties in this struggle. See American Capitalism—The Concept of Countervailing Power (2d ed. 1956). And see especially, concerning the relevance of the concept to labor-management relations, pp. 114–17, 136, 151–53. Concerning the fears of those who regret the growth of countervailing power because it threatens possibly larger and bloodier struggles between approximately equal giants, see the following observations (p. 147):

"A number who have accepted as desirable the development of countervailing power by previously disadvantaged groups have been nonetheless careful to point out that it is decidedly a second-best solution. Given the power of the modern industrial corporation, it is doubtless well that those who do business with it have the capacity to protect themselves. But how much better to have avoided this struggle between the behemoths. There is something frightening and possibly dangerous about this bargaining between vast aggregations. How much better to have denied power to all. The world of countervailing power may be tolerable but it is highly imperfect.

"This is an appealing argument although it is not likely to appeal to anyone who is interested in results. Past efforts to extirpate economic power have been notably unavailing. One cannot suppose that they will be more successful in the future. Economic power may indeed be inherent in successful capitalism. We had better be content with restraints we have than to search for a never-never land in which they would be rendered unnecessary."

13. The charging Union, at least, does not concede that such adamant insistence would be unlawful. For present purposes we assume, without having to decide, that the Union is wrong in this. Cf. N.L.R.B. v. International Brotherhood of Elec. Wkrs., 266 F.2d 349 (5th Cir. 1959); National Labor Relations Board v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958).

It purported to do so in its letter of April 13, 1966. And this, it may be recalled, was the letter that led to the May 4 meeting where the IUE Committee included the seven outsiders.

But there was no bargaining at all, let alone "joint" or "multi-union" bargaining, on May 4 or thereafter. The abrupt departure of respondent's committee precluded it. And here we reach a critical aspect of respondent's position. The appearance of the outer seven, respondent says, exposed a plot "to impose multi-union bargaining on the Company" (Post Hearing Brief, p. 58); the "expanded bargaining committee was a bold and overt step in the march of the unions toward multi-union bargaining" (id., p. 71). In this view, it makes no difference that the IUE Committee said it had come only on IUE business. Likewise, there was no point in attempting to bargain and to see whether "multi-union" matters were proffered for consideration. The very constitution of the Union Committee, respondent says, imprinted the multi-union taint.

There is in all this a seeming notion that "multi-union bargaining" has some of the qualities of a stealthy disease, and that the Company might have been insidiously and unknowingly infected with it. The IUE had given its word that the effort to achieve such bargaining was over. Its Committee had arrived on May 4 with this assurance to respondent. Unless there is some mystery in all this, respondent's people could have tested the assurance by proceeding to bargain and waiting to see what happened.

We reject respondent's thesis and hold that it could not walk out in a state of supposed or pretended certainty that the Union's promise would be broken. There is sound reason, and substantial precedent, for dismissing the argument that representatives from other unions inevitably bring the infection of unlawful or non-mandatory joint bargaining. Standard Oil Company v. N.L.R.B., 322 F.2d 40 (6th Cir. 1963); American Radiator & Standard Sanitary Corporation, 155 N.L.R.B. No. 69 (Nov.1965).

The argument is not less fallacious in this case because of the background of "unity" and joint bargaining proposals before May 4 on which respondent puts heavy emphasis. The IUE was entitled to change its course; following respondent's persuasive view of the law on joint bargaining, it was required to do so. The law, like other normative disciplines, contemplates the possibility of, and welcomes, penitence. Respondent was not privileged to do less. Whether its stubborn refusal to listen on May 4 reflected earnest conviction, or was merely a considered ploy in the establishment of a litigating posture, it could not be justified by the conjectural claim that the IUE team was ineluctably bent on "multi-union bargaining." (See the nearly identical conjectures in Standard Oil Company v. N.L.R.B., supra, 322 F.2d at 43–44.) What the IUE was bent upon could only be determined with respondent's professed certainty by doing what respondent chose not to do—by staying and bargaining and seeing whether the IUE had lied when it said it had come to negotiate only for its own agreement. The choice respondent made, foreclosing any possibility of accommodation or understanding, was an elementary form of wrong under the Labor Act. It was, as petitioner asserts, an unlawful refusal to bargain.

4. There remains respondent's claim that the "coalition" of unions had agreed that none would sign any agreement with respondent unless or until all were ready to do so. We accept for this case the premise that such an arrangement among the unions would have been unlawful, and we assume further, though this may be more debatable, that one result would have been to erase respondent's duty to bargain with IUE. Cf. Standard Oil Co. v. N.L.R.B., supra. The assumptions do not absolve respondent.

It might be enough at this point to recall and repeat our finding that there was in fact no such agreement among the unions. But we go further and note that the whole subject, despite the eloquent lengths to which counsel have gone

for it, is not more than an irrelevant afterthought.

It is conceded that respondent's single ground for fleeing from the May 4 meeting was the presence of the seven from other unions. But, for them, we are assured, respondent's people would have stayed and bargained. With this much conceded, the argument that the eight unions were "locked in" (to refrain from agreeing unless all agreed) becomes immaterial. At least as immaterial is respondent's extended argument that we should draw here upon the learning of conspiracy cases to infer that there was a secret plot to stay "locked in" despite the high assurances to the contrary. For if any of this mattered, respondent's one sticking-point would have been silly. If there was a conspiracy locking the unions in—and a secret one at that—it could plainly have proceeded whether or not outside people sat in on IUE sessions. Indeed, the sinister quality suggested by respondent's theory is actually diluted by the IUE's insistence on having the seven present. Conspirators are normally more conspiratorial. By the same token, if respondent had really been motivated by a belief in a conspiracy, it could scarcely have said, as it still does, that its objections would end with the departure of the seven.

At any rate, despite respondent's perseverance on this point, it was obliterated by respondent's chief witness at the hearing. This witness, respondent's Labor Relations Counsel, describing in detail the evolution and rationale of the Company's position, acknowledged candidly on the stand that the problem of a possible "lock-in" was at most a future contingency as of May 4, 1966. As he put it:

" * * * A point like that does not really come to fruition in terms of limiting the flexibility of the unions until sometime down the bargaining road, and on May 4th we considered it a purely truly anticipatory sort of thing."

■ That testimony neatly epitomizes the pervasive flaw in respondent's strategy and in its attempted defense against the Board's complaint. The Company's walkout of May 4, taken in the best possible light, was inexcusablly premature. If the IUE was ever to press impermissibly for "multi-union bargaining" or to demonstrate that it was unlawfully "locked in," either or both possibilities could only have materialized "sometime down the bargaining road." Respondent's asserted fears were never put to the test because it stopped and got off the road before the journey started.

■ A professed certainty that bargaining will become futile or lawless is no substitute for performance of the duty to bargain. Cf. N.L.R.B. v. Sunrise Lumber & Trim Corp., 241 F.2d 620, 624–625 (2d Cir.), cert. denied, 355 U.S. 818, 78 S.Ct. 22, 2 L.Ed.2d 34 (1957); N.L.R.B. v. Jacobs Mfg. Co., 196 F.2d 680, 683 (2d Cir.1952). Respondent breached that duty on May 4, 1966, and remains in default to this day.

*Third,* the standards for preliminary injunctions under Section 10(j)

The parties have debated long and instructively the problem of criteria to govern (a) when the Board ought properly to seek a preliminary injunction under Section 10(j), and (b) when, if one is sought, it should be granted.

■ As to the first question, while the statute is not explicit on this, it seems plain in the scheme of things that the drastic remedy ought to be reserved for situations of special need. The effect of a district court's 10(j) injunction is to order, before the agency has heard the matter, relief which is normally given only if and when the Board has exercised its primary jurisdiction and persuaded a Court of Appeals to agree with it. Recognizing the extraordinary character of such relief, the Board has in fact sought it only infrequently.

Respondent concludes that the Board is authorized to move under Section 10(j)

only when the alleged violation is "flagrant"—apparently using the strong word to mean not only clear, but heinous and aggravated as well. Some occasional statements recorded in print give a semblance of support to this contention. Respondent cites, for example, speeches by individual Board members suggesting "flagrancy" as the standard for resort to Section 10(j). Closer to home, the petition in the instant case alleges that respondent has been guilty of "flagrant unfair labor practices," and it may be, strictly speaking, that this should not have been said unless it was tendered as a material assertion. Furthermore, the Board appears elsewhere to have announced "that it is the policy of the Board not to apply for a temporary injunction under Section [10(j)] unless unusual circumstances exist"—for example, an employer's "patent flouting of the Union's right to bargain collectively * * * without any legal basis" for such recalcitrance. Reynolds v. Herron Yarn Mills, 53 CCH Lab.Rel.Cases ¶ 11,347, p. 17,148 (W.D.Tenn., May 23, 1966).

■■■■ What emerges, however, is not the kind of straitened test respondent proposes. There is nothing in the language of the statute or its history to support this restrictive view. Though an alleged violation may not fairly be branded "flagrant," the remedy of Section 10 (j) is surely appropriate and available when the impact upon the public interest is grave enough to justify swifter cor-

rective action than the normal process of Board adjudication and court enforcement. The present case, involving a huge and basic enterprise with substantial impact upon the national defense and the economy generally, seems clearly to qualify.

■■■■ It should be said, further, that Congress entrusted to the Board as the responsible agency the essential judgment whether the public interest requires the machinery of Section 10(j) to be set in motion. Cf. National Labor Relations Board v. Indiana & Michigan Electric Co., 318 U.S. 9, 18–19, 63 S.Ct. 394, 87 L.Ed. 579 (1943); Guss v. Utah Labor Relations Board, 353 U.S. 1, 8–9, 77 S.Ct. 598, 1 L.Ed.2d 601 (1957); Haleston Drug Stores v. National Labor Relations Board, 187 F.2d 418 (9th Cir.), cert. denied, 342 U.S. 815, 72 S.Ct. 29, 96 L.Ed. 616 (1951).[14] To be sure, the Section empowers the district court "to grant * * * such temporary relief or restraining order *as it deems just and proper*" (emphasis added). And that mandate may be assumed here, at least *arguendo*, to import discretion sufficient to deny relief in routine unfair labor practice cases for which there is no good reason to short-circuit the normal processes of administrative hearing and judicial review. But cf. Douds v. International Longshoremen's Ass'n, 242 F.2d 808, 811–812 (2d Cir.1957). However that may be, the facts at bar scarcely suggest that the Board abused its own discretion when it concluded that prelimi-

---

14. It seems desirable—it would surely be helpful—for the Board, after nearly twenty years of work with Section 10(j), to formulate and state in some form more authoritative than random speeches by members the criteria by which it determines whether to proceed under this Section. Such a formulation would guide the public, the courts, the agency itself, and give a measure of assurance that the action taken in individudal cases is reasonably principled. This is not the first time, of course, that the Board as well as other agencies have been urged to tackle more widely the hard task of

articulating intelligible and knowable rules of general applicability. See, e. g., Friendly, The Federal Administrative Agencies—The Need for Better Definition of Standards (1962); Peck, The Atrophied Rule-Making Power, 70 Yale L.J. 729 (1961). But it is clear that the Board has broad power to postpone or eschew grand ideals and proceed case by case; respondent has refrained, soundly, from suggesting that the Board erred here because it followed such a course. Cf. Securities & Exchange Comm'n v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 1760, 91 L.Ed. 1995 (1947).

nary relief is warranted and desirable in the public interest.[15]

While we have treated as if it were an open question respondent's theory that Section 10(j) is only for "flagrant" cases, the argument is also answered by a long course of judicial decision demonstrating that there is no such test. As the cases have evolved, it has become clear that the district courts are neither to demand a showing of "flagrancy" nor to displace the Board's primary decisional authority, but must only determine in a Section 10(j) proceeding whether the Board has "reasonable cause to believe" that the accused party has been guilty of unfair labor practices. Douds v. International Longshoremen's Ass'n, 241 F.2d 278, 281 (2d Cir.1957); McLeod for and on Behalf of N.L.R.B. v. Compressed Air, Foundation, Tunnel, Etc., Wkrs., 292 F.2d 358, 359, 361 (2d Cir.1961). To establish that, the Board, which has yet to make its administrative record, is not required to show more than a "reasonable possibility" that there will be an ultimate determination against the respondent. McLeod for and on Behalf of N.L.R.B. v. Local 25, International Bro. of Elec. Wkrs., 344 F.2d 634, 638, 639 (2d Cir.1965); Schauffler for and on Behalf of N.L.R.B. v. Local 1291, Internat'l Longshoremen's Ass'n, 292 F.2d 182, 187–188 (3d Cir.1961); Brown for and on Behalf of N.L.R.B. v. Pacific Telephone and Telegraph Co., 218 F.2d 542, 543 (9th Cir.1955).[16] This much,

15. The court is urgently invited by respondent to "balance the equities." Sufficient reason has been indicated already for declining the invitation; the Congress substantially struck the balance when it wrote Section 10(j), leaving particular implementations mainly for the Board's administrative judgment. Cf. Douds v. International Longshoremen's Ass'n, 242 F.2d 808, 811–812 (2d Cir. 1957); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 609–610, 72 S.Ct. 863, 96 L.Ed. 1153, 26 A.L.R.2d 1378 (1952) (Frankfurter, J., concurring); Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Even if this were not so, however, the balance would not tip for respondent; for the equities are heavily on the side of petitioner. Respondent has violated a basic statutory duty which Congress imposed "to substitute collective bargaining for economic warfare * * *." Mastro Plastics Corp. v. National Labor Relations Board, 350 U.S. 270, 284, 76 S.Ct. 349, 359, 100 L.Ed. 309 (1956); see also Douds v. International Longshoremen's Ass'n, supra, 241 F.2d at 282. The injunction petitioner seeks requires only that respondent proceed to bargain. Respondent, reporting vivid fears about the union "coalition," says meeting at a table where the seven intruders are present has to be a step on the road to a company-wide strike rather than littler strikes or none at all. The inexorability of this reasoning has not been demonstrated. There may, in the end, be a strike—even, against hope, a costly one. If there is, it will not be because respondent has proceeded to the bargain-

ing table to test the possibility of agreement and the good faith of the IUE.

16. Respondent has relied heavily upon the majority opinion of Judge Marshall in McLeod for and on Behalf of N. L. R. B. v. Business Machine & Office App. Mech. Conf. Bd., 300 F.2d 237 (2d Cir. 1962), where the district court's granting of an injunction under Section 10(l), not 10 (j), was reversed. There, respondent stresses, the Court of Appeals observed that the district court must find not only "reasonable cause" to expect a Board decision that there has been an unfair labor practice, but also "reasonable cause to believe that a Board decision * * * will be enforced by a Court of Appeals." Id. at 242 n. 17. The language, in its context, is not of particular value to respondent. Under Section 10 (l), the application for an injunction is mandatory, not discretionary, and is made by a regional officer or attorney without leave or sanction from the Board. Under 10 (j), involved here, the Board, in its discretion, decides whether to seek an injunction. In the cited case, the charge and petition for an injunction were thought by the Court of Appeals to be opposed to existing Board precedent. And the problem, both in the district court and on appeal, was solely one of law.

In that setting, what the appellate court said (though it appears not to have been repeated or cited since) is reconcilable with the standard as it is usually defined. Superficially, there are difficulties of an obvious kind in forecasting what a court of appeals will do in reviewing an administrative ruling not yet delivered.

for reasons already reviewed at length, the petitioner has certainly demonstrated.

If it were necessary, the point could be put more strongly. The parties have made a detailed record. Despite respondent's proposed inferences about secret motives and hidden plots, there is little in the way of material dispute concerning the facts. The points of controversy are essentially legal rather than factual. Without meaning to usurp the Board's primary role, but merely to explicate the court's conclusions, it may be said that the decision would go for the petitioner as a matter of independent judgment if such a judgment were either required or permissible.

An order will issue restraining the respondent, pending final disposition of the Board's complaint, in accordance with the prayer of the petition. Counsel will settle such an order on notice.

As a practical matter, however, at least where the question is one of law, this can hardly mean more than a judgment by the district court that there is "reasonable cause" to consider the legal position of petitioner correct. And this, however the test is stated, is likely to describe what really happens. A district court, supposedly competent to decide questions of law, might well hesitate to issue an injunction on what it determines are fallacious legal premises.