**GENERAL ELECTRIC COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS BOARD,** Respondent,

and

**International Union of Electrical, Radio and Machine Workers, AFL–CIO,**
Intervenor.

No. 567, Docket 32867.

United States Court of Appeals
Second Circuit.

Argued May 9, 1969.

Decided June 9, 1969.

David L. Benetar, New York City (Nordlinger, Riegelman, Benetar & Charney, Herbert D. Schwartzman, New York City, on the brief), for petitioner.

John I. Taylor, Atty., National Labor Relations Board (Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Michael N. Sohn, Atty., Washington, D. C., on the brief), for respondent.

Irving Abramson, Washington, D. C., for intervenor.

Lambert H. Miller, Gen. Counsel, Fred B. Haught, Asst. Counsel, National Assn. of Manufacturers of U. S. of America, as amicus curiae.

Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.

FEINBERG, Circuit Judge:

In the spring of 1966, General Electric Company walked out of a meeting with the International Union of Electrical, Radio and Machine Workers, AFL-CIO (IUE), because the Company objected to the presence on the IUE bargaining committee of representatives of other unions. Since then, the legality of that IUE ne-

gotiating technique has been the subject of much litigation, both in the courts and before the National Labor Relations Board, as yet inconclusive. And so three years later, with national bargaining on a new contract about to begin, the basic issue is again before us on the Company's petition for review of a decision of the National Labor Relations Board that the Company's actions in 1966 amounted to refusal to bargain with the IUE in violation of sections 8(a) (1) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a) (1), (5). The Board has cross-petitioned for enforcement of its order, which directs the Company to bargain with the selected negotiating committee of the IUE in the future. For reasons set forth below, we modify the Board order insofar as it found a Company violation prior to August 1966, and enforce the order as modified. Of equal —or perhaps more—importance, we attempt to clarify some of the rights and obligations of the Company and the IUE in future bargaining.

I

General Electric is a New York corporation which manufactures and sells electrical equipment and related products, including many for the national defense and atomic energy programs. It employs about 290,000 people in over 60 plants and 400 other installations, such as service shops and warehouses. It operates in all of the 50 states. About half of its employees are represented by more than 80 unions in about 150 bargaining units. Approximately 80,000 employees in some 90 of these units are represented by the IUE.

The IUE is an international labor union which has 600 affiliated local unions with a membership of about 314,000. For some time the Company and the IUE have bargained on a national basis for a contract covering all of the 90 units represented by the IUE or one of its locals;

the national agreement is then supplemented by local agreements. The 1963–1966 contract was due to expire on October 2, 1966, and contained the usual provision for notice of not more than 60 nor less than 30 days prior to expiration if either party wished to modify or terminate the agreement. In November 1965, however, the parties began corresponding—mainly through John Callahan, chairman of the IUE General Electric Conference Board,[1] and Phillip D. Moore, manager of General Electric Employee Relations Service—about the possibility of advance contract discussions. The parties had used this procedure before to lay the groundwork for formal bargaining and had apparently found it useful. Despite the expressed desire of both sides to commence discussions, they were unable to agree even to a meeting to formulate the necessary ground rules for the consideration of various matters by subcommittee. The primary stumbling block was the Company's fear that the IUE was using its request for preliminary discussions as a device to further the desire of IUE and other unions for joint company-wide bargaining.

The Company's apprehension was not without foundation. For some time, the IUE and other unions representing the Company's employees had been concerned over the results of their separate efforts to bargain with General Electric. According to the unions, the Company had successfully followed a practice of divide and conquer in the past by making a separate "fair, firm offer" almost simultaneously to each union and then whipsawing one against the other. In any event, dissatisfied with the results of their prior separate efforts, the unions in 1965 formed a Committee on Collective Bargaining (CCB), consisting eventually of the IUE and seven other international unions whose locals also had agreements with General Electric.[2] The avowed pur-

1. Composed of delegates from IUE local unions representing General Electric employees.

2. They were the Allied Industrial Workers, American Federation of Technical Engineers, American Flint Glass Workers, International Association of Machinists, International Brotherhood of Electrical Workers, Sheet Metal Workers, and United Automobile Workers.

poses of the members of the CCB were to coordinate bargaining in 1966 with General Electric and its chief competitor, Westinghouse Electric Corporation, to formulate national goals, and otherwise to support one another.

The CCB made several efforts to persuade the Company to meet with it for joint informal discussions on various matters; presumably, this would have taken the place of preliminary discussions with the IUE alone. The last such CCB proposal was rejected by the Company on March 25, 1966. On the same day, Moore wrote to Callahan of IUE, stating that the Company was "very receptive to appropriate pre-negotiation discussions with IUE, but * * * [did] not intend to participate in any eight-union coalition discussions or in any other steps in the direction of industry-wide bargaining." On April 13, Callahan responded and suggested that a meeting be called to formulate rules for subcommittee meetings. He stated that the IUE had not intended any formal request for joint bargaining and that the IUE would "abandon any suggestions for any such joint meeting or for joint discussions." Thereafter, Moore agreed to a meeting and the date was set for May 4.

The May 4 meeting never took place. When the IUE representatives arrived that morning, the Company for the first time became aware of the addition of seven members to the IUE negotiating committee, one member of each of the other seven unions that comprised the CCB. The Company representatives attended the meeting only long enough to announce that they would meet "only with * * * IUE people." The Company subsequently maintained its position even after it had been told that the seven new members of the IUE committee were non-voting members who were present solely to aid in IUE negotiations and not to represent their own unions.

On May 9, 1966, the IUE filed failure to bargain charges with the Board, citing the Company's refusal to meet on May 4.

The Board's complaint issued on July 13. However, prior to any hearing thereon, the Board moved in the United States District Court for the Southern District of New York under section 10(j) of the Act, 29 U.S.C. § 160(j), for a preliminary injunction compelling the Company to bargain with the expanded IUE committee. An extensive hearing was held in the district court before Marvin E. Frankel, J., in late July. On August 2, 1966, the IUE formally requested in writing that the Company open contract talks under the reopener provision of the national agreement. The letter, which was received on August 3, asked for meetings on August 15, 16 and 17 to consider IUE's proposals for contract changes. On August 9, Moore replied, accepting an August 15 meeting date but making it quite clear that the Company was agreeing to meet only on the condition that no "representatives of other unions" be present. The Company adhered to this position until August 18 when the district court granted the Board's request for a preliminary injunction compelling the Company to meet with the enlarged IUE committee. McLeod v. General Electric Co., 257 F.Supp. 690 (S.D.N.Y.1966). Thereafter, the Company did meet commencing on August 23, 1966, although it said it was doing so under protest. Suiting its action to its words, the Company appealed from the district court injunction. On September 8, this court reversed that order on the ground that it would be more appropriate for the case—which posed a basic and novel question of law—to "follow the path of Board hearing and decision on the unfair labor practice charges, rather than to shortcircuit the established administrative design." 366 F.2d 847, 850 (2d Cir. 1966). Our mandate issued on September 20, and the Company immediately refused to talk to the "outsiders" on the bargaining committee. On the afternoon of September 21, when Mr. Justice Harlan stayed the mandate of this court, 87 S.Ct. 5, 17 L.Ed.2d 45 (1966), General Electric resumed discussions with the "mixed" committee.

The national agreement expired without agreement on a new contract on October 2. With the aid of a presidential panel, however, agreement was finally reached on October 14. Thereafter, the Supreme Court granted certiorari in the 10(j) case, setting aside the judgment of this court and remanding the matter to the district court to "determine * * * the effect of this supervening event." 385 U.S. 533, 535, 87 S.Ct. 637, 639, 17 L.Ed.2d 588 (1967) (*per curiam*). No further proceedings were conducted there, however, the refusal to bargain charge having already gone to a trial examiner for hearing and decision on an amended complaint. In June 1967, the trial examiner found the Company guilty of a refusal to bargain commencing on May 4, 1966, and continuing to and after August 15, 1966. Despite our prior suggestion that the Board handle the controversy "promptly," 366 F.2d at 850, it did not issue its decision until October 1968, 16 months later. The Board found that the Company refused to bargain on May 4 by walking out of the meeting, that this violation continued until August 23, and that it recurred briefly on September 20 and 21. The Board noted that it would find a violation on and after August 18, even if the Company had no duty to bargain prior to that date. 173 N.L.R.B. No. 46 (1968). Finally, the Board emphasized its narrow holding, stating:

> [W]e need not decide whether Respondent's refusal to bargain might have been justified if, in fact, the participating unions had been "locked in" to a conspiratorial understanding. By walking out of the May 4 meeting, Respondent precluded our consideration of this issue. Nor need we decide whether Respondent could lawfully have suspended negotiations if, during the course of the discussions, it became apparent that the non-IUE representatives were seeking to bargain for their own unions, rather than for the IUE. These situations raise questions which are not presented by the instant case. In this case, we are only called upon to decide whether the mere presence on the IUE Negotiating Committee of representatives from unions other than the IUE justified Respondent's refusal to bargain, there being no evidence that these representatives bargained in bad faith or for employees other than those represented by the IUE. Our dissenting colleague would hold that the mere presence of these "outsiders" did privilege a refusal to bargain, even absent a specific finding of bad faith, because their presence was inherently disruptive of the bargaining process. We disagree.

Member Zagoria dissented in part, finding a violation only on and after August 18. Member Jenkins dissented on the ground that inclusion of members of other unions on the IUE committee justified the Company's refusal to bargain.

## II

The basic question before us is whether a union's inclusion of members of other unions on its bargaining committee justifies an employer's refusal to bargain. The Company contends that there is more to the case than that, claiming that the IUE was engaged in an illegal attempt to obliterate bargaining unit lines and was, as the Board put it, " 'locked in' to a conspiratorial understanding." We discuss that phase of the case below, but turn first to the crucial issue before us.

■ Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, guarantees certain rights to employees, including the right to join together in labor organizations and "to bargain collectively through representatives of their own choosing." This right of employees and the corresponding right of employers, see section 8(b) (1) (B) of the Act, 29 U.S.C. § 158(b) (1) (B), to choose whomever they wish to represent them in formal labor negotiations is fundamental to the statutory scheme. In general, either side can choose as it sees fit and neither can control the other's selection, a proposition confirmed in a num-

ber of opinions, some of fairly ancient vintage. For example, the following asserted objections to bargaining representatives have all been rejected as defenses to charges of refusal to bargain: that a local union president could not act for the international union in grievance handling, see Prudential Insurance Co. of America v. NLRB, 278 F.2d 181, 182–183 (3d Cir. 1960); that an AFL "general organizer," not a member or officer of the union, could not bargain for the latter, see NLRB v. Deena Artware, Inc., 198 F.2d 645, 650–651 (6th Cir. 1952), cert. denied, 345 U.S. 906, 73 S.Ct. 644, 97 L.Ed. 1342 (1953); that employees could not be represented by a local union, a majority of whose members were employed by a rival industry and which the employees were not eligible to join, see Pueblo Gas & Fuel Co. v. NLRB, 118 F.2d 304, 307–308 (10th Cir. 1941); and that an international union representative could not negotiate for a local, see Oliver Corp., 74 N.L.R.B. 483 (1947).

There have been exceptions to the general rule that either side can choose its bargaining representatives freely, but they have been rare and confined to situations so infected with ill-will, usually personal, or conflict of interest as to make good-faith bargaining impractical. See, e. g., NLRB v. ILGWU, 274 F.2d 376, 379 (3d Cir. 1960) (ex-union official added to employer committee to "put one over on the union"); Bausch & Lomb Optical Co., 108 N.L.R.B. 1555 (1954) (union established company in direct competition with employer); NLRB v. Kentucky Utilities Co., 182 F.2d 810 (6th Cir. 1950) (union negotiator had expressed great personal animosity towards employer). But cf. NLRB v. Signal Manufacturing Co., 351 F.2d 471 (1st Cir. 1965) (per curiam), cert. denied, 382 U.S. 985, 86 S.Ct. 562, 15 L.Ed.2d 474 (1966) (similar claim of animosity rejected). Thus, the freedom to select representatives is not absolute, but that does not detract from its significance. Rather the narrowness and infrequency of approved exceptions to

the general rule emphasizes its importance. Thus, in arguing that employees may not select members of other unions as "representatives of their own choosing" on a negotiating committee, the Company clearly undertakes a considerable burden, characterized in an analogous situation in NLRB v. David Buttrick Co., 399 F.2d 505, 507 (1st Cir. 1968), as the showing of a "clear and present" danger to the collective bargaining process.

Other than the general line of cases outlined above, there is little authority bearing on the precise point before us. In Standard Oil Co. v. NLRB, 322 F.2d 40 (6th Cir. 1963), four oil refineries of the same company constituted separate bargaining units; one was represented by an international union and the other three by locals thereof. The union bargaining committee for each refinery added temporary representatives from the others, purportedly to improve communications between them. The employer objected on the ground that the temporary representatives were "part of a subtle plot to bring about company-wide bargaining." The unions' disclaimer of any such intention was accepted by the hearing examiner and the Board. In enforcing the Board order, which found a company refusal to bargain, the Court of Appeals for the Sixth Circuit said, 322 F.2d at 44:

> Absent any finding of bad faith or ulterior motive on the part of the Unions we conclude that it was the duty of the Company to negotiate with the bargaining committees of the Unions at the respective refinery plants even though the temporary representatives were present. * * * We find no unusual or exceptional circumstances here that would warrant the Company's refusal to bargain.

General Electric seeks to distinguish *Standard Oil* on the ground that the additional representatives there came from locals of the same international union at other plants rather than from entirely separate unions representing different crafts, but the distinction is not per-

suasive. The Sixth Circuit apparently thought that if the expanded bargaining committees actually had tried to force a single bargaining for the four units, the employer could properly have resisted.[3] Cf. Douds v. International Longshoremen's Ass'n, 241 F.2d 278, 282–283 (2d Cir. 1957). The true point was that absent such "ulterior motive," the employees could choose their representatives freely. That the Sixth Circuit so regarded the case is indicated by its later description of it as holding "that a union has the right to select outsiders to sit in and assist a local bargaining committee." American Radiator & Standard Sanitary Corp. v. NLRB, 381 F.2d 632, 634 (6th Cir. 1967). The *American Radiator* decision could be regarded as otherwise inconclusive on the issue before us, but we note that the Eighth Circuit apparently found dictum in that case supporting the legality of a mixed-union committee. See Minnesota Mining & Manufacturing Co. v. Meter, 385 F.2d 265, 273 (8th Cir. 1967).[4] In short, although there is no court of appeals' decision directly on point, what authority there is supports the Board and not the Company.

Turning to specific policy reasons for inclusion of members of other unions on a negotiating committee, we are told that a union has an interest in using experts to bargain, whether the expertise be on technical, substantive matters or on the general art of negotiating. In filling that need, no good reason appears why it may not look to "outsiders," just as an employer is free to do. See Detroit Newspaper Publishers Ass'n v. NLRB, 372 F.2d 569, 572 (6th Cir. 1967); NLRB v. Local 294, International Broth-

erhood of Teamsters, 284 F.2d 893 (2d Cir. 1960). However, the heat generated by this controversy does not arise from that bland consideration. The Company has in the past made effective use of its own ability to plan centralized bargaining strategy in dealing with the various unions representing its employees while keeping the actual bargaining with each union separate. As Judge Frankel pointed out in McLeod v. General Electric Co., *supra*, 257 F.Supp. at 694:

> [T]he practice is to formulate a set of national company proposals for presentation to the IUE and the UE, two of the three unions with which there is bargaining on a national scale. Before these proposals are presented to the unions, the Company's employee relations managers are called to the New York main office, where copies are given and explained to them. The Company then presents the proposals to the IUE and UE. Normally within a day or two thereafter * * *, upon instructions from the New York headquarters, the same proposals are given by the local managers to the local representatives around the country of all the varying unions with which the Company deals on a so-called local basis * * *. At the same time, and commonly before the unions have announced their acceptance or rejection, the uniform set of proposals is publicized to the Company's employees. This mode of centralized administration, despite the multiplicity of bargaining units and representatives, is rendered feasible in part because the Company's collective agreements, with an insignificant number of exceptions, have uniform expiration dates.

3. In another portion of its opinion, the court did hold that the unions had acted improperly in refusing on a joint basis to sign the contracts until all units were satisfied. 322 F.2d at 45.

4. The Eighth Circuit in this case followed our lead in reversing a 10(j) injunction so that the case could follow the normal course of administrative decision and judicial review. Thereafter, as in the pres-

ent case, the Board found the employer guilty of an unfair labor practice and ordered it to bargain with the union's selected bargaining committee, including representatives of other unions. Minnesota Mining & Mfg. Co., 173 N.L.R.B. No. 47 (1968). We are informed that the case is now back before the court of appeals on the employer's petition to review the Board order.

IUE claims that having members of the other unions on its committee increases communications between all of them and to that extent reduces the ability of the Company to play one off against the other. In any event, the plain facts are that the IUE proposed negotiating technique is a response to the Company's past bargaining practices, that it is designed to strengthen the IUE's bargaining position, and that both sides know it.

The Board held that a mixed-union negotiating committee is not per se improper and that absent a showing of "substantial evidence of ulterior motive or bad faith" an employer commits an unfair labor practice unless it bargains with such a group. The Company and *amicus* attack the Board rule on a number of grounds. They claim that the rule will inevitably allow the injection of conflicting interests and "outside and extraneous influences" into the bargaining process, will make the always difficult task of determining the motives of the other side an impossibility, is an improper effort by the Board to adjust economic power, and finally is unworkable because an employer confronted with bad faith or ulterior motives can only break off negotiations with the mixed group and file unfair labor practices charges with the Board, an option disruptive of collective bargaining at best and in actuality no remedy at all.

The claim that outside influences and alleged conflicts require an outright ban on mixed-union committees is not weighty in view of the cases discussed above, pp. 516–517. Equally unpersuasive is the assertion that the Board made an improper effort to adjust economic power. The Board gave no such rationale for its decision. Of course, it would be nonsense to pretend that IUE's purpose was not to increase its bargaining strength, but that goal is a normal one for unions or employers. That Board application of an old policy to a new situation may have such an effect does not vitiate a rule if it is otherwise justified. The possibilty that there will be improper attempts to ignore unit boundaries is, of course, real. The Company argues that different unions certified for separate units may not force an employer to bargain with them jointly as to all units on any subject, despite the implications of United States Pipe & Foundry Co. v. NLRB, 298 F.2d 873 (5th Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1557, 8 L.Ed.2d 499 (1962), which approved an arrangement whereby three unions conditioned their agreements in separate but substantially simultaneous negotiations upon a joint demand for common contract expiration dates. The Board did not come to grips with this problem, and we similarly do not now consider the extent to which the law permits cooperation in bargaining among unions or employers. Compare Wagner, Multi-Union Bargaining: A Legal Analysis, 19 Lab.L.J. 731 (1968), and Note, Is Coalition Bargaining Legal?, 18 W.Res.L.Rev. 575 (1967), with Anker, Pattern Bargaining, Antitrust Laws and the National Labor Relations Act, 19 N.Y.U.Ann.Conf. on Labor 81 (1967). The point is that the chance that negotiators may improperly press impermissible subjects is inherent in the bargaining process, and therefore must be taken. As to the increased difficulty in determining motives of the other side, we agree that this may occur. However, although evidence that bargaining for other employees is being attempted may be difficult to obtain, the Board is certainly capable of making such a determination when a case comes before it. See Kennecott Copper Co., 70 Lab.Rel. Rep. 199 (Feb. 17, 1969) (trial examiner's decision), adopted by the Board, 70 Lab.Rel.Rep. 427 (April 4, 1969). Indeed, the dangers foreseen could exist even if there were no members of other unions on a committee if, for example, the unions were to meet together immediately before and after each bargaining session. Surely an employer would not be justified because of that fact alone in refusing to meet even though evidence of an attempt by the unions to merge bargaining units or to obtain a

common bargaining agreement would, if anything, be more difficult to produce. We agree that a mixed-union committee could make it easier to press such plans illegally, although not by that much, in view of modern communication techniques. Nevertheless, cooperation between unions is not improper up to a point and it is for the Board in the first instance to determine whether the line has been crossed. In view of the overall policy of encouraging free selection of representatives, we agree with the Board's rejection of a per se rule which bans mixed-union committees.

In sum, we do not think that the Company has demonstrated the type of clear and present danger to the bargaining process that is required to overcome the burden on one who objects to the representatives selected by the other party. We hold that the IUE did have the right to include members of other unions on its negotiating committee, and the Company was not lawfully entitled to refuse to bargain with that committee so long as it sought to bargain solely on behalf of those employees represented by the IUE, a question we discuss further below.

### III

Even if its objections to the composition of the IUE committee were not well-founded, the Company claims it never violated a duty to bargain. It argues that it had no such duty until 15 days after the IUE written notification of reopening, or August 18, 1966, and did bargain thereafter. The Company points out that it was ready to go ahead with meetings on August 18, after the district court handed down its opinion, and thus cannot be faulted for the delay

to August 23. Finally, it contends that the situation in September was *de minimis*.

As to the period before the formal contract reopener in August, the Board found that the Company had agreed to a limited reopening of the contract to discuss preliminary matters,[5] that this agreement was unconditional—or at least not conditioned on the presence of a "traditional" IUE negotiating committee —and that having agreed even to this limited reopening the Company was necessarily bound by the traditional requirements of good faith bargaining. The Company strenuously disputes all three propositions.

On this aspect of the case, we agree in substance with the Company. While the Company did agree to a May 4 meeting to discuss preliminary matters, its agreement was based on its understanding of the type of committee with which it would meet. The April 13 IUE letter noted that the Company was unwilling to hold a joint meeting and stated that the IUE "will abandon any suggestions for any such joint meeting or for joint discussions." That letter certainly gave the impression that a "joint" committee was a thing of the past; whether this was calculated, as the Company contends, or inadvertent is beside the point. There is no doubt that if the letter had proposed that the Company meet with a committee that included members of other unions, the Company would have speedily declined. The more basic question is whether it would have had the right to do so. It is not clear whether the Board decided that issue, since it found that the Company agreed to bargain early and that the agreement was unconditional.[6] At oral argument, however,

---

5. The trial examiner found that the reopener was not limited and that the parties agreed to commence general negotiations for a new contract on May 4.

6. The Board stated:
   Our holding is a narrow one. It is merely that if the parties agree to the early start of negotiations, they must conform to the same standards of good-

faith bargaining required of parties after the formal contract reopening date. Just as GE on August 18, could not exercise a veto power on the Union's selection of a bargaining committee, so our present holding is only that GE could not exercise such a veto power during the agreed upon early preliminary bargaining negotiations. We are not holding that GE must consent to

the Board took the position that while it recognized the distinction between informal preliminary discussions based upon mutual consent in the spring of 1966 and mandatory bargaining in August, the Company's condition would be equally illegal in either period.

■ We do not agree with this contention. The Company had an absolute right to refrain from preliminary meetings before the formal notice of reopening, and it could condition its agreement to preliminary discussions in the manner that it sought to. The Board argues that even a voluntary act cannot be conditioned on an illegal condition, e. g., that it would have been improper to condition a meeting in the pre-August period on the discharge of the Union leadership. However, that egregious hypothetical is not this case. Moreover, the proposition begs the question, which is what is an "illegal" condition in the preliminary discussion period? It is not true that anything that would be improper in the mandatory bargaining period must be so regarded at the earlier time of preliminary discussions. For example, formal bargaining can ordinarily be broken off only after an impasse. To do so before is a violation, see NLRB v. Katz, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), and an unyielding attempt to retain the right to do so would also seem improper, cf. NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958). Yet, the IUE proposed on May 4 that it (or the Company) unilaterally have the right to cancel "the whole series" of subcommittee meetings on one week's notice, and we think that it could have remained adamant as to that condition for preliminary discussions. Similarly, while withholding a negotiator's authority to enter into a binding agreement

contract negotiations before the contract reopening date, nor are we deciding that GE must agree to put into effect immediately any agreements reached during these preliminary negotiations.

may be indicative of a failure to bargain in good faith in the mandatory bargaining period, see Chicago, Rock Island & Pacific R.R. v. Switchmen's Union, 292 F.2d 61, 67 (2d Cir. 1961), the proposal here to limit the authority of the subcommittees to agree in the preliminary period was completely unobjectionable. The real point is that there is a difference between the two periods and that distinctions, which are the stuff of the law, are called for. Allowing a mixed-union committee does present dangers to the good faith bargaining process which may turn out to be real, as we recognize above. While we have concluded that the dangers are not so great as to bar such a committee in the mandatory bargaining period, nevertheless when an employer is asked to meet informally and voluntarily it may properly take these factors into account. Whatever further experience may teach, at this time and on this record we are not prepared to import automatically the bulk of the requirements of the mandatory bargaining period into preliminary discussions, at least when we are talking about the conditions for having a meeting at all rather than what transpires thereafter. Therefore, we conclude that the Company could condition a meeting on a "traditional" IUE committee in the informal pre-August period,[7] regardless of its inability to do so later in the mandatory bargaining period. Obviously, we do not pass upon the wisdom of such a negotiating position in the future. It may well be that "preliminary" discussions are helpful—particularly in "crisis" bargaining—as the Board suggests. If so, it is for a party who seeks to use that procedural device to decide whether to adhere rigidly to a technically legal position, when aware that the right to do so will shortly disappear when the mandatory bargaining period begins.

7. We note that this issue was not decided by Judge Frankel in the 10(j) suit because the parties stipulated for the purposes of that action to waive the prematurity argument. McLeod v. General Elec. Co., *supra*, 257 F.Supp. at 698, n. 6.

**522**

■ The Board's finding that the Company refused to bargain after receipt of the IUE notice on August 3 is on a firmer basis. There can be no doubt that under section 8(d) of the Act, 29 U.S.C. § 158(d), and the IUE-General Electric national agreement itself, the Company was under a duty to bargain after that date. It is true, of course, that the contract permitted the Company to decline to meet for 15 days after it was given notice, and had it done only that there could have been no violation prior to August 18. However, it did not do so. Moore's letter of August 9, 1966, revealed the Company's position that, absent a court order, it would not meet with the IUE committee so long as the IUE claimed the right to include members of other unions. Although the letter could be read charitably to mean only that the Company would prefer not to meet with the expanded committee prior to August 18, that is scarcely the natural reading. Moreover, from May 4 on the Company's adamant position was that the IUE had no right to put members of other unions on its negotiating committee. That it staked its all on that position throughout the entire period is further evidenced by the Company's conduct on September 20 and 21. Having done so, it cannot now claim that its violations were mere technicalities or *de minimis* when its position turns out to be incorrect. Cf. NLRB v. M & M Oldsmobile, Inc., 377 F.2d 712, 716–717 (2d Cir. 1967).

## IV

Thus, we have decided that it was improper for the Company to refuse to bargain in August 1966 on the ground that members of other unions were on the IUE committee. However, we must still deal with the Company's claim that in any event it could refuse to meet with the IUE committee because the CCB was attempting to use it to impose joint bargaining upon the Company and because the IUE was "locked-in" to an agreement whereby it would not accept any offer made by the Company until the other unions did.

■ The Board rejected these contentions without deciding whether either factor would have justified a refusal to meet. Instead, the Board held that the Company had the duty once the IUE had retreated from its advocacy of joint bargaining, to put the negotiators to the test. In so holding, the Board followed the lead of Judge Frankel in the 10(j) injunction proceedings. Of course, both before Judge Frankel, who did not consider the prematurity issue, see note 7 *supra*, and the Board, the question was whether the Company had the duty to test the IUE's intentions beginning in May 1966, and we have concluded that no such duty could have existed until August. However, the trial examiner found that on May 4 the IUE was neither "locked-in" nor bent on joint bargaining, and the Board found that there was no substantial evidence of the IUE committee's ulterior motive or bad faith. Moreover, if we focus only on the situation in August and thereafter, with which we are specifically concerned, the Board's determination has, if anything, more support. Throughout the proceedings before Judge Frankel the IUE disclaimed any intention to bargain for others and maintained its ability to enter into any agreement that satisfied its demands regardless of the position of other unions. Still, the Company did not offer to test IUE's good faith. Rather it continued to refuse to meet until required to by court order. Moreover, during the period when the Company had to—and did—deal with the mixed IUE committee, the committee neither bargained nor tried to bargain for employees other than those represented by IUE. Nevertheless, the Company completely ignored the "outsiders" during bargaining sessions on September 20 and 21. The Company claims that the mixed committee was on its best behavior because it knew that this was a test case. While there may

be force to this argument, it does not justify setting aside a determination that the Company had no sufficient basis for concluding that the committee planned to bargain improperly. In sum, we think that the Board's findings on this aspect of the case are supported by substantial evidence and must be upheld.

The Company was thus guilty of a refusal to bargain in violation of section 8(a) (1) and (5) of the Act. We have considered the Company's other arguments, including the claim that evidence was erroneously excluded by the trial examiner, and IUE's modest objections to the order, and find no error sufficient to require overruling the Board. The order of the Board is set aside insofar as it rests on a violation of the Act prior to August 1966. With this modification, the order is enforced.