**MINNESOTA MINING AND MANUFAC-
TURING COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 19508.**

United States Court of Appeals
Eighth Circuit.

Sept. 4, 1969.

Thomas M. Vogt, of Felhaber, Larson, Fenlon & Vogt, St. Paul, Minn., for petitioner, Thomas J. Scheuerman, St. Paul, Minn., on the briefs.

John I. Taylor, Atty., N. L. R. B., Washington, D. C., for respondent, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Michael N. Sohn, Atty., N. L. R. B., on the brief.

Before VOGEL, MATTHES and BRIGHT, Circuit Judges.

BRIGHT, Circuit Judge.

In this proceeding, the National Labor Relations Board found that Minnesota

Mining and Manufacturing Company (3M) violated § 8(a) (1) and (5) of the National Labor Relations Act [1] in refusing to meet and negotiate with representatives of the Oil, Chemical and Atomic Workers Union (OCAW), AFL-CIO, representing employees at 3M's St. Paul and Chemolite (Hastings), Minnesota plants. The Company here petitions for review of, and the Board has filed a cross-application to enforce, the Board's order which, among other things, directs the Company to bargain with OCAW "including any representatives of other unions whom it has invited to attend the negotiations for the purpose of participating in the discussion and advising and consulting with the Union". The Company originally justified its refusal to bargain on the basis that the Union included in its negotiating committee two men who were employed at other 3M plants and who were members of other unions, allegedly as a part of a Union plan to impose "coordinated bargaining" for all of 3M's plants.

To this defense, the Trial Examiner found and the Board approved the following:

"The Company contends that the Union's ultimate aim is 'coordinated bargaining', that is, bargaining which will embrace more than the single unit the Union represents, and which will settle terms for other units and at other plants. The record does establish that this [is] an ultimate objective of the Union, * * * the presence of representatives of other labor organizations in the St. Paul and Hastings negotiations may well be an opening wedge in this hoped-for development. The Company perhaps should not be blamed for trying to keep the union camel from sticking its nose under the tent. But whatever may be the Company's fears, and howsoever accurate its prognostication and its discernment of the Union's ultimate aims, the Company here and now is under a duty to bargain with the Union, and this encompasses a duty to bargain with whatever representatives the Union chooses to send. The mere possibility of future abuse (which indeed the Union disclaims), is no justification for an anticipatory refusal to bargain."

We affirm the Board's determination.

Initially, the Union had filed an unfair labor practice charge against 3M. The Regional Director of the National Labor Relations Board then sought a temporary injunction from the United States District Court under § 10(j) of the Act, 29 U.S.C. § 160(j), to compel the Company to bargain with the Union committee prior to the administrative resolution of the unfair labor practice charge by the N.L.R.B. The trial court issued the injunction. This Court reversed but specifically refrained from deciding the issue presented in the present petition and cross-application for enforcement. Minnesota Mining & Mfg. Co. v. Meter, 385 F.2d 265 (8th Cir. 1967), *rev'g*, 273 F.Supp. 659 (1967).

The facts which are not in dispute and which have been detailed in the earlier reported decisions are restated here in so far as necessary for an understanding of the problem. The Company manufactures industrial abrasives, tapes, duplicating equipment, and numerous other products. It operates approximately seventy plants throughout the country and has some fifty-five separate collective bargaining agreements with local unions, which are variously affiliated with some twenty to twenty-five different international unions. Different locals of the OCAW International represent employees at eight of 3M's plants. OCAW Local No. 6-75 is the certified bargaining representative of production and maintenance employees at the St. Paul plant, which is the largest in the 3M complex employing about 2450 people. Local No. 6-418 of the OCAW occupies a similar role at the Hastings plant which employs about

1. 29 U.S.C.A. § 158(a) (1) and (5).

850 people. The separate collective bargaining agreements at the St. Paul and Hastings plants were scheduled to expire on August 27, 1967. None of the labor contracts at other 3M plants expired simultaneously nor were any others then open for bargaining or extension.

Early in June, 1967, in planning for negotiations on a new labor contract, the Union representative wrote:

"We also wish to inform you that our Negotiating Committee for the forthcoming Negotiations will at times include certain Members or Officers of other Labor Organizations. These individuals, when they participate in our Negotiations, will be part of our Bargaining Committee, and will be Negotiating only for our Bargaining Unit. We have been advised that we have the Legal Right to include such persons on our Negotiating Committee. If you have any objections to their participation, please let me know immediately so that we can attempt to come to some understanding about this matter before the Negotiations commence."

In prior years, each of the two local unions had been represented by a negotiating committee composed of both officers and regular members, plus a representative or representatives from the International Union. Occasionally, a member of the Industrial Union Department of the AFL-CIO sat with the negotiating committees when the discussions pertained to pensions. The Trial Examiner noted that 3M voiced no objections to the presence of experts at the negotiations for the purpose of discussing such subjects as safety conditions, incentive plans, pensions, insurance, and the like. The Company's specific objection in this case was to the presence of officers or members of union locals from other 3M plants when the contract discussions directly concerned only the St. Paul and Hastings facilities. On June 27, and again on July 7, 1967, 3M's Director of Industrial Relations told Union representatives that 3M would not bargain with a committee which included officers or members of other union locals. On July 10, following telephone conversations, 3M's Director of Industrial Relations wrote the Union: " * * * [W]e are prepared to meet under the same conditions as in the past at any time which is mutually convenient to work out a new agreement for St. Paul and Chemolite [Hastings]". On that same date, the Union filed its unfair labor practice charge with the Board. The issue crystalized when, on July 14 at an arranged meeting, the St. Paul and Hastings locals (contrary to what 3M understood to be the prior commitment) brought an employee from the Chattanooga, Tennessee, 3M plant and an employee from the 3M plant at Bristol, Pennsylvania, into the negotiating room. Both of these employees belonged to other locals. Company negotiators immediately left the meeting.

The Company contends that the appearance of employees from other plants constituted an initial ploy in the Union's plan to force 3M to negotiate major economic items on a company-wide level. The Company asserts that its obligation to continue meeting with the Union committee terminated when the Union demonstrated that it intended to require bargaining beyond the appropriate St. Paul-Hastings units.

It is settled that labor representatives may not insist on bargaining for employees whom they do not, in fact, represent. NLRB v. Local 19, International Brotherhood of Longshoremen, 286 F.2d 661, 664 (7th Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L. Ed.2d 25 (1961); NLRB v. International Brotherhood of Electrical Workers, 266 F.2d 349 (5th Cir. 1959); Douds v. International Longshoremen's Ass'n, 241 F.2d 278, 281–283 (2d Cir. 1957). Neither party to this litigation takes issue with this principle. The Company, however, suggests that the appearance of the two outsiders at the negotiating session, together with other evidence, conclusively establishes an unlawful

motive on the part of the Union committee which excused 3M's walkout. It contends:

(1) The Industrial Union Department (IUD) of the AFL-CIO of which OCAW is an affiliated member had announced that the ultimate goal of coordinated bargaining was to force companies to negotiate major economic items on a national level and, in particular, had advised that its objectives for 3M were uniformity in the expiration dates of contracts and complete bargaining by 1967.

(2) Representatives of the St. Paul and Hastings locals were in attendance at the meetings of the IUD in April of 1967, and at those meetings a decision was made that representatives of other local unions having labor contracts in various other 3M plants would participate in the St. Paul-Hastings negotiations.

(3) The Company further contends that the Union demonstrated bad faith in its approach to the preliminary bargaining session with the Company by bringing outsiders into the bargaining sessions notwithstanding an agreement that negotiations would be conducted similarly to those in the past. The Union's bad faith was an element precipitating the Company walkout from the meeting.

Because the Trial Examiner noted that the Union's ultimate aim may be multi-plant or coordinated bargaining, the Company argues that the Board's conclusion that the Company illegally refused to bargain was erroneous as a matter of law. General Counsel, however, asserts that all of the Union negotiators, including those who normally represented units at other plants, were to engage in bargaining at the meeting solely on behalf of the two Minnesota plants involved. The General Counsel, thus, concludes that the Company had no right to refuse to negotiate with the committee. Among other things, the General Counsel has observed:

(1) The 3M charge that the Union contemplated engaging in company-wide bargaining in the present negotiations was based on sheer speculation. By walking out of the session, the Company could only offer a guess on what might have occurred during the negotiations.

(2) The Union would have been within its rights in asking 3M to negotiate for a contract covering more than the St. Paul and Hastings plants. While it is settled that a Union may not bargain for employees whom it does not represent, it is equally true that the parties may agree to multi-party bargaining even though certifications are limited to a single plant. 3M could have accepted a proposal for multi-plant bargaining if it wished.[2]

(3) The testimony established that the employees from the Chattanooga and Bristol plants were to serve as consultants; that they were to have no vote or control over negotiations; and that the Company could not have been forced into multi-unit bargaining because the St. Paul and Hastings labor contracts were the only ones then open for consideration.

(4) The documentary evidence relied on by the Company had not been authorized by the Union. Further, that evidence furnished only slight evidence of Union intent that was refuted by contrary testimony of responsible members of the Union's negotiating committee.

▮▮ In general, an employee bargaining representative is entitled to determine the composition of its own bargaining committee and an employer, absent extraordinary circumstances, is required to meet with the individuals

2. "What the Act does not permit is the *insistence*, as a condition precedent to entering into a collective bargaining agreement, that the other party to the negotiations agree to a provision or take some action which is unlawful or inconsistent with the basic policy of the Act." National Maritime Union, 78 NLRB 971, 981–982 (1948). *See*, Detroit Newspaper Publishers Association v. N.L.R.B., 372 F.2d 569 (6th Cir. 1967).

selected. 29 U.S.C. § 157; General Electric Co. v. NLRB, 412 F.2d 512 (2d Cir., June 9, 1969); NLRB v. David Buttrick Co., 399 F.2d 505, 507 (1st Cir. 1968); Standard Oil Co. v. NLRB, 332 F.2d 40, 44 (6th Cir. 1963). In the instant case, substantial evidence supports the Trial Examiner's finding that the Union negotiators, including those who normally represented other unions, were to engage solely in negotiations on behalf of the St. Paul and Hastings units. In addition, the Trial Examiner concluded that the presence of personnel from other unions on the Union bargaining committee was for the proper purpose of facilitating the exchange of information among the various locals. The Union at no time insisted that the negotiations pertain to matters other than renewal of the bargaining agreements at the St. Paul and Hastings plants. On this record, we feel that the Trial Examiner correctly held: "The mere possibility of future abuse (which indeed the Union disclaims), is no justification for an anticipatory refusal to bargain". See, Cutler v. NLRB, 395 F.2d 287, 290 (2d Cir. 1968); Standard Oil Co. v. NLRB, 322 F.2d at 44–45. We do not feel that 3M's disapproval of the composition of the Union bargaining committee justified its refusal to bargain even though the presence of two "outsiders" permits an inference that there might be cooperation among various unions.

█ In a similar factual situation, the Second Circuit enforced a Board bargaining order where the Company had walked out of negotiations with the Union because of the presence of members of other unions on the Union bargaining committee. As Judge Feinberg observed, the mere presence of outside union personnel cannot justify the Company's fears that the Union will pursue unlawful objects or improper methods in bargaining.

"Indeed, the dangers foreseen could exist even if there were no members of other unions on a committee if, for example, the unions were to meet together immediately before and after each bargaining session. Surely an employer would not be justified because of that fact alone in refusing to meet even though evidence of an attempt by the unions to merge bargaining units or to obtain a common bargaining agreement would, if anything, be more difficult to produce."

General Electric Co. v. NLRB, 412 F.2d at 519.

Our own record discloses that in 1962, three or four representatives of other unions, who were present in the same hotel which housed the negotiations, conferred with representatives of the bargaining committee for the locals during recesses and after hours. 3M makes no contention that such cooperation exceeds permissible bounds. We perceive no real distinction in personnel from other unions exchanging information with the bargaining committee at the conference table and exchanging information after hours. In this case, the Company emitted a cry of pain before it sustained any injury.

On this issue we are in agreement with the viewpoint of the Second Circuit:

"[C]ooperation between unions is not improper up to a point and it is for the Board in the first instance to determine whether the line has been crossed. In view of the overall policy of encouraging free selection of representatives, we agree with the Board's rejection of a per se rule which bans mixed-union committees."

General Electric Co. v. NLRB, 412 F.2d at 520 (1969).

We grant enforcement of the Board's order.