NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

INDIANA AND MICHIGAN ELECTRIC COMPANY, Respondent.

No. 77–1685.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1979.

Decided May 21, 1979.

Rehearing and Rehearing En Banc Denied July 11, 1979.

---

L. Joseph Ferrara, NLRB, Washington, D. C., for petitioner.

John A. McGuinn, Washington, D. C., for respondent.

Before TONE and WOOD, Circuit Judges, and EAST,* District Judge.

EAST, District Judge.

The petitioner National Labor Relations Board (the Board) seeks enforcement of its order issued against the respondent Indiana and Michigan Electric Company (the Company) on May 11, 1977 and reported at 229 NLRB No. 95. The Board reaffirmed its order in a supplemental decision and order issued on April 24, 1978 and reported at 235 NLRB No. 159. We note jurisdiction of the proceeding under § 10(e) of the National Labor Relations Act (the Act), as amended 29 U.S.C. § 151, *et seq.*, and enforce the order.

*BACKGROUND FACTS:*

The Company is an incorporated Indiana public utility which generates and sells electricity in Indiana and Michigan. The Company and Local 1392, International Brotherhood of Electrical Workers, AFL–CIO (the Union) are presently parties to four collective bargaining agreements. These agreements separately cover Company employees in the following four bargaining units in Indiana and Michigan: (1) South Bend, Benton Harbor and Twin Branch Generating Divisions; (2) Marion and Muncie Divisions; (3) Fort Wayne Division; and (4) General Office Transmission Construction and Maintenance Group. The Fort Wayne Division unit was established in 1934 through the Company's voluntary recognition, while the other three units were established between 1952 and 1971 through Board certification.

In early 1971, the Union's predecessor locals filed with the Board's 25th Regional Office (the Regional Office), over Company opposition, unit clarification and amendment of certification petitions requesting establishment of a single company-wide bargaining unit. The Regional Office dismissed these petitions. In September, 1971, the predecessor locals merged into the Union. The Company agreed to recognize the Union so long as the separate identities of the four bargaining units were maintained.

In 1972, and again in early 1975, the Company filed with the Regional Office unfair labor practice charges alleging, in effect, that the Union was attempting to engage in a company-wide bargaining in derogation of the established four units. In both cases, the Regional Office determined that the evidence did not support the charges and refused to issue unfair labor practice complaints. In the 1972 case, the Board's General Counsel upheld on appeal the Regional Office decision.

In the 1975–76 collective bargaining cycle, the four then existing contracts expired on different dates between October 31 and December 31, 1975.[1] The parties set separate schedules of contract renewal negotiations for each of the four units.

The initial bargaining session was held on September 23 for the South Bend, Benton Harbor and Twin Branch Generating Divisions unit, whose existing contract expired first. At that meeting, the Union suggested, as it had in the past, that negotiations be combined for all four units. The Union repeated this suggestion at the next negotiating session on October 1 for the Marion and Muncie Divisions unit. On each occasion, the Company rejected the Union's suggestion. At the September 23rd meeting, the Union made neither "local" demands relating to the South Bend, Benton Harbor and Twin Branch Generating Divisions unit

---

* Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation.

1. Hereafter, except as otherwise noted, date references are to the period September, 1975 to March, 1976.

nor economic demands. In later bargaining sessions, the Union's demands in the four units were very similar.

During the September and October negotiations, the Union was represented by a single bargaining committee consisting of nine to eleven members. The committee consisted of Chester M. Herriman, the Union's Business Manager; a union international representative; employee members of the specific unit to which the bargaining in question directly pertained; and employee members drawn from other units. The employee representatives in the last category were called "travelers," a designation referring to the necessity of their traveling from their own units in order to attend negotiations in other units.[2] At a union meeting prior to the September bargaining session, employees elected some of the travelers, and the union leadership appointed the others. Travelers participated without Company protest in the first four bargaining sessions—September 23, October 1, October 8, and October 9.

Immediately after the meeting on October 9, 1975, in South Bend, Mr. Willmore, the Company's Labor Supervisor, and Mr. Herriman agreed on a schedule for further meetings in all four units. The schedule tentatively agreed upon called for the following meetings in the following units:

1. South Bend, Benton Harbor, Twin Branch unit—October 29 and 30.
2. Marion-Muncie unit—November 10 and 18.
3. General Office unit—November 26, December 11, 12 and 18.
4. Fort Wayne unit—December 2, 3, and 10.

Up to this point in the negotiations, Willmore had not been concerned about the presence of travelers in the negotiations because of past experience with respect to such travelers in the 1973 and 1974 negotiations. In those negotiations, the custom was that the travelers would attend one or two of the initial meetings and then attend no further meetings. In 1973, at the initial Marion-Muncie meeting, for example, there were in attendance one employee from South Bend, one employee from Benton Harbor, one employee from Twin Branch and one employee from Fort Wayne. However, the maximum number of days off requested by employees in the 1973 and 1974 negotiations to attend meetings in units outside of their own unit was two days. The negotiations in 1973 and in 1974 each spanned 12 meetings for the bargaining units involved.

Lyle Van Aman, an employee traveler, who was at the October 9th meeting where the tentative schedule was agreed upon, requested to be off work on the 11 days in question. His request was transmitted through the personnel supervisor in the Fort Wayne Division to Willmore. Upon receipt of the request for 11 days off, the Company re-examined its policy of allowing time off to travelers.

Around October 21, the Company denied Van Aman and the other employee travelers permission to take leave without pay in order to attend negotiations in units other than their own. The Company justified this action on the alleged ground that such leave, particularly in the case of Van Aman, would be burdensome to administer and that the Union's use of travelers was an attempt to effect company-wide bargaining. The next bargaining session, the fifth, on October 29, was aborted when the Company adhered to its position regarding travelers and the Union refused to proceed with negotiations until the Company permitted the participation of travelers.

On October 30, the Union filed the unfair labor practice charge in this case, complaining, in part, of the Company's refusal to allow travelers to engage in negotiations. At about this same time, Union International Representative Everett J. Bailey asked Willmore for a negotiating meeting on the following Saturday, which was not a regular working day, or on any Saturday,

---

2. In prior years, the Union had made some use of travelers in collective negotiations; and in the 1973 and 1974 negotiations, the Company excused from work, but did not pay, travelers or non-travelers while they attended or traveled to and from bargaining sessions.

Sunday, or evening when Van Aman, as well as the other Union bargaining committee members, would be able to attend. On November 10, Herriman wrote Willmore, also requesting negotiations outside normal working hours in order to permit the attendance of the Union bargaining committee. On November 21, Willmore responded by a letter rejecting this alternative proposal on the ground that "it [would be] unreasonable, under the present circumstances, to ask members of the various Company committees to devote their nights or weekends to negotiation."

On December 31, the Regional Office issued the unfair labor practice complaint on the Union's October 30th charge. The Regional Office refused, however, to issue a complaint on a charge filed by the Company alleging that the Union's use of travelers was an attempt to effect company-wide bargaining. On February 18, the General Counsel, on appeal, affirmed the refusal to issue the complaint on the Company's charge.[3]

On June 24, 1976, the Administrative Law Judge (ALJ) dismissed the complaint of December 31 and found that the release of employees to travel to other bargaining units was "burdensome" for the Company to administer, and that bargaining at night and on weekends, for both the management and Union committees who had normal work assignments during the working day, "would be deleterious to their performance and morale and to the efficiency of Respondent's operations."

On May 11, 1977, the Board reversed the ALJ and concluded that the Company violated § 8(a)(5) and (1) of the Act by refusing to grant travelers uncompensated leave to permit them to engage in bargaining during working hours, while simultaneously refusing the Union's request to bargain during nonworking hours since its conduct interfered with the Union's right to select its own bargaining representatives.

*BOARD'S PERTINENT FINDINGS:*

The Board found that the Company had failed to make an evidentiary showing sufficient to overcome the employees' right to select their own bargaining representatives.

The Board's order requires the Company to cease and desist from the violation found, from "[i]n any like or related manner interfering with, restraining, or coercing its employees in the exercise of rights guaranteed by Section 7 of the Act." Affirmatively, the Board's order requires the Company, upon request, to meet and bargain with the Union pursuant to the Act; if understandings are reached, to embody them in written signed agreements; and to post the Board's remedial notices. The Board further noted that in view of the currently effective bargaining agreements between the parties, its order did not require the Company to bargain with the Union concerning the alteration of any terms prior to the date for reopening or renegotiating the agreements.

On October 7, 1977, the Board notified the parties that it had decided, sua sponte, to reconsider its decision. Because the ALJ had found for the Company on other grounds, he had not reached the Company's affirmative defense that the Union's use of travelers was an unlawful attempt to compel company-wide bargaining. In originally reversing the ALJ, the Board had not addressed that affirmative defense. In its supplemental decision, the Board found that the record evidence upon which the Company relied failed to establish that the Union was actually insisting on bargaining in a single unit, because there was no evidence that the Union threatened to reject all of the Company's bargaining offers in the four units unless common offers were received, or that it withheld ratification, or otherwise threatened economic pressure to force commonality of Company offers. The Board, therefore, rejected the Company's affirma-

3. On January 7, the Company agreed, without prejudice to its position in this case, to excuse travelers from work in order to permit resumption of negotiations. Thereafter in March, fol-

lowing a February strike by the Union, the parties concluded four separate contracts, one for each of the four units.

tive defense and reaffirmed its initial decision and order.

*ISSUES ON REVIEW:*

The conclusive issues on review are:

1. Whether substantial evidence on the record as a whole supports the Board's finding that the Company's refusal to allow certain employee members of the Union's collective bargaining committee to participate in negotiating sessions outside their own bargaining units violated § 8(a)(5) and (1) of the Act by interfering with the Union's right to select its own bargaining representatives; and

2. Whether the Union's conduct from 1971 through the 1975–76 negotiations evidences a scheme to force multi-unit bargaining on the Company in violation of § 8(b)(3) of the Act, thereby precluding the existence of a situation in which the Company's good faith can be tested.

The Company's issue questioning the ALJ's order for 1971–76 Union records as improper is without merit.

*DISCUSSION:*

▆▆▆ We recognize that the Act's guarantee of free choice encompasses the right of employees to select, absent extraordinary circumstances, whomever they wish to represent them in collective negotiations with employers. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 33, 57 S.Ct. 615, 81 L.Ed. 893 (1937); *Schmerler Ford, Inc. v. NLRB*, 424 F.2d 1335, 1339 (7th Cir.), *cert. denied*, 400 U.S. 823, 91 S.Ct. 45, 27 L.Ed.2d 52 (1970). An employer has the burden of showing the existence of such extraordinary circumstances. Otherwise the employer violates the Act by interfering with its employees' choice of negotiators, or by refusing to deal with the negotiators once selected. *Minnesota Mining and Manufacturing Co. v. NLRB*, 415 F.2d 174, 177–78 (8th Cir. 1969); *General Electric Co. v. NLRB*, 412 F.2d 512, 516–17 (2d Cir. 1969); *NLRB v. David Buttrick Co.*, 399 F.2d 505,

507 (1st Cir. 1968); and *Standard Oil Co. v. NLRB*, 322 F.2d 40, 44 (6th Cir. 1963).

*General Electric Co.*, 412 F.2d at 517, teaches:

"There have been exceptions to the general rule that either side can choose its bargaining representatives freely, but they have been rare and confined to situations so infected with ill-will, usually personal, or conflict of interest as to make good-faith bargaining impractical. . . . Thus, the freedom to select representatives is not absolute, but that does not detract from its significance. Rather the narrowness and infrequency of approved exceptions to the general rule emphasizes its importance. Thus, in arguing that employees may not select members of other unions as 'representatives of their own choosing' on a negotiating committee, the Company clearly undertakes a considerable burden, characterized in an analogous situation in *NLRB v. David Buttrick Co.*, 399 F.2d 505, 507 (1st Cir. 1968), as the showing of a 'clear and present' danger to the collective bargaining process."

▆▆▆ It follows that the union members' reason for the choice of a given representative is subject to limited scrutiny. This premise is based upon the principle of affording broad protection for employees' free choice of their bargaining representatives and applies equally where, as in the present case, a union engages in what has been termed "coordinated bargaining."[4] Absent extraordinary circumstances, an employer may not refuse to bargain on the basis of objections to a bargaining representative's use of coordinated bargaining. *Minnesota Mining and Manufacturing Co.; General Electric Co.; Standard Oil Co.; Indianapolis Newspapers, Inc.*, 224 NLRB 1490, 1499–1500 (1976); and *Harley Davidson Motor Co.*, 214 NLRB 433, 437–38 (1974).

---

4. Coordinated bargaining is a negotiating technique whereby a union coordinates its bargaining with other unions or other bargaining units by including on its negotiating panel members of such other unions or bargaining units.

We reiterate that the Company has recognized four separate bargaining units within its operations. The Union's selected bargaining committee for a given unit contains one or more members of a separate unit or units (travelers). The Union asserts the reason for selecting Van Aman as a member of the questioned bargaining committee was to foster communication among the Units. *Au contraire*, asserts the Company. It claims that the Union selected Van Aman as a tactic to illegally force company-wide bargaining. This argument is based on the principle that because the periphery of an employer's bargaining obligation is fixed by the limits of each particular existing unit, a union may not use the device of coordinated bargaining to force company-wide negotiations upon an employer in derogation of established separate bargaining units. *Utility Workers Local 111*, 203 NLRB 230, 238 (1973); *enforced per curiam*, 490 F.2d 1383 (6th Cir. 1974).

Such a premise of the Company is easily stated but not so easily applied to a given factual situation. The tidal force of the employees' right to freely choose their representatives creates the riptide from the force of the right of the Company to be protected from a "clear and present" danger to a good faith collective bargaining process as well as from a forced company-wide bargaining situation. We believe that the Board could properly find that the Company's refusal to grant Van Aman the requested time off to attend the 11 scheduled meetings, or, alternatively, to schedule weekend meetings, effectively denied the employees representation by Van Aman. It could also reasonably conclude that any economic hardship or managerial disruption suffered by the Company is manifestly less than that recognized by the Company from sick leave and vacation time for employees arrived at through collective bargaining.

As for the Company's claim of a union forced company-wide bargaining situation, we recite that an employer may not lawfully refuse to bargain with a union negotiating committee or committees simply because the union is coordinating the various bargaining efforts and the employer suspects or anticipates that the union may ultimately use this coordination to force it into company-wide negotiations. Rather, to justify a refusal to bargain on that score, an employer must demonstrate that the coordinated bargaining in question is done in bad faith with the purpose of forcing a company-wide bargaining situation—that is, that the union is actually abusing the device and not simply that the union might do so in the future. *General Electric Co.*, 412 F.2d at 517. *Accord, Minnesota Mining and Manufacturing Co.*, 415 F.2d at 178.

We are impressed with the colorful language of the Board's trial examiner in *Minnesota Mining and Manufacturing Co.* as restated in 415 F.2d at 175:

"'The Company perhaps should not be blamed for trying to keep the union camel from sticking its nose under the tent. But whatever may be the Company's fears, and howsoever accurate its prognostication and its discernment of the Union's ultimate aims, the Company here and now is under a duty to bargain with the Union and this encompasses a duty to bargain with whatever representatives the Union chooses to send. The mere possibility of future abuse (which indeed the Union disclaims), is no justification for an anticipatory refusal to bargain.'"

We have perused the evidentiary record and find that when considered as a whole, the Board's pertinent and material findings of fact are supported by substantial evidence, and we conclude that the Board's conclusions based upon the particular facts of this cause are supported by law. The issues in this cause heavily involve:

"the conflicting interests of labor and management, and as such 'the Board's determination is to be subjected to "limited judicial review"', *Brown, supra*, 380 U.S. [278] at 290, 85 S.Ct. [980] at 987 [13 L.Ed.2d 839]. Indeed, the Board is in a far better position than is this court to determine whether certain actions do or do not actually pose a danger to the collective bargaining process. *See National*

Labor Relations Board ·v. J. Weingarten, Inc., 420 U.S. 251, 266–67, 95 S.Ct. 959, 43 L.Ed.2d 171 (1975); General Electric, supra, 412 F.2d at 520." Intern. Broth. of Elec. Wkrs., AFL–CIO v. NLRB, 557 F.2d 995, 998 (2d Cir. 1977).

The Board's petition for enforcement of its orders is granted.

ENFORCED.

HARLINGTON WOOD, Jr., Circuit Judge, dissenting.

I respectfully dissent. I concur with Board Member Walter's dissent to the Board's Decision and Order in which he supports the views of the Administrative Law Judge.

The substantial record evidence as found by the Administrative Law Judge refutes, not supports, the Board's decision. The ALJ found that the company's action, was not unlawfully motivated or otherwise improper under the Act, but was nondiscriminatory and occasioned by perceived bona fide operational needs. When company employee Van Aman, a key "trouble-shooter" on call around the clock for emergencies, requested 11 days off to attend the meetings, the company was compelled to reexamine its policy. The company represents that there were five employees on the traveling committee who attended bargaining sessions on 18 different days resulting in about 90 man-days lost to the company. This, I view, as unwarranted and unauthorized business disruption. The company had no objection to time off for employees to bargain for their own unit.

There was no collective bargaining agreement negotiated between the union and the company permitting employees to take time off to bargain outside their units at other locations. With this case as precedent there will no longer be any need for a union to bargain on that issue. The company has lost any right to bargain for some reasonable control or limitation on the practice. The union has gained a new bargaining tactic subject to obvious abuse. No limita-

tion is placed on the number of employees nor the amount of time off that the union can now impose on an employer against its business judgment.

This is not a case of an employer merely refusing to bargain with a committee containing "outsiders" as in General Electric Co. v. NLRB, 412 F.2d 512 (2d Cir. 1969), cited by the majority. That and similar cases stand only for the general proposition that either party may freely choose its own bargaining representatives, including members from a different union. The issue, however, was not whether or not an employer should be required against its will and in the absence of a contractual agreement to permit employee uncontrolled time off for bargaining elsewhere in another separate unit. I find no statutory basis or precedential support for the majority view.

To give the company a way out of the imposed burden by bargaining at the end of the work day or on weekends or holidays is not a reasonable fair choice. Both management and employees should be entitled to some time off from their regular labors for rest and relaxation. Tired employees after late bargaining sessions could not be expected to be up to their normal efficiency on the subsequent work day. The union has not suggested that employees devote their vacation time to "travelling" for union bargaining purposes.

Another consideration in this case is that the union since 1971 has been consistently endeavoring one way or the other to cause the four separate bargaining units to be consolidated into one. In 1971 the Regional Director denied the union petitions seeking consolidation. Even at the beginning of these particular negotiations the union was requesting joint bargaining for all four units. To use the terminology quoted by the majority,[1] the union camel has been constantly circling the company tent probing for a way to stick its nose under. Now the Board itself had indirectly lifted the edge of the tent to make it easy.

1. Minnesota Mining and Mfg. Co. v. NLRB, 415 F.2d 174 (8th Cir. 1969).